# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JEFFRY L. SANFORD

VERSUS

JOSHUA KIRST, HERBERT ALLEN,
and the CITY OF BATON ROUGE

CIVIL ACTION

NO. 21-347-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (the "*Motion*")
(Doc. 15) filed by Defendants Joshua Kirst named in his individual capacity ("Kirst"), Herbert
Allen named in his individual capacity ("Allen"), and the City of Baton Rouge ("the City")
(collectively, "Defendants"). Plaintiff Jeffry L. Sanford ("Plaintiff" or "Sanford") opposes the
*Motion*. (Doc. 25.) Defendants filed a reply. (Doc. 32.) Oral argument is not necessary. The Court
has carefully considered the law, the facts in the record, and the arguments and submissions of the
parties and is prepared to rule.

For the following reasons, Defendants' *Motion* is granted with respect to the federal law
claims. Consequently, those claims will be dismissed with prejudice. Further, because the federal
claims will be dismissed, the Court will decline to exercise supplemental jurisdiction over the state
law claims asserted against Defendants. As such, the state law claims will be dismissed without
prejudice.

## I.    Preliminary Issues

### A.  Violations of Local Rule 56

Local Rule 56 requires a party opposing a motion for summary judgment to "submit with
its opposition a separate, short, and concise statement of material facts" that admits, denies, or
qualifies the facts set forth in the moving party's statement of material facts. M.D. La. Civ. R.

56(c). In denying or qualifying facts set forth in the moving party's statement of material facts, the opposing party must support each denial or qualification with a citation to the specific page or paragraph of identified record material supporting the party's assertion that the fact is, in whole or in part, incorrect or untrue. *Id.* R. 56(c), (f).

Here, Defendants properly submitted a short and concise statement of facts they contend are undisputed and material to this case, each of which is set forth in separately numbered paragraphs and supported by citations to the record. (*See Statement of Uncontested Material Facts in Support of Motion for Summary Judgment* ("*Def. SUMF*"), Doc. 15-3.) Plaintiff responded by submitting an opposing statement of material facts with his opposition brief. (*See Plaintiffs' Response to R. Doc. [15-3] Statement of Material Facts* ("*Pl. OSMF*"), Doc. 25-1.) Although some of the responses set forth in Plaintiff's opposing statement of material facts comply with Local Rule 56, many of them do not. For example, some of the denials lack any citation to the record for support, (*see id.* ¶¶ 8, 11), some of Plaintiff's responses are replete with legal conclusions and fail to address whether there is a *factual* dispute, (*see id.* ¶¶ 12, 13, 16), and in some instances, it is either unclear whether Plaintiff is denying, qualifying, or admitting a fact, (*see id.* ¶ 10), or Plaintiff responds with additional facts without clarifying whether he is admitting, denying, or qualifying the fact proposed by Defendants, (*see id.* ¶ 19).

Relevant here, Local Rule 56(f) provides: "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be *deemed admitted* unless *properly controverted*." M.D. La. Civ. R. 56(f) (emphasis added). As explained above, Defendants properly supported their factual assertions with record citations, and Plaintiff failed to properly controvert them in accordance with the local rules. For this reason, the facts set

forth in Defendants' supporting statement of material facts that were not properly controverted, as indicated above, are deemed admitted for summary judgment purposes.

That said, "case law recognizes that the Court can still consider record evidence to determine if there is a factual dispute." *Braud v. Wal-Mart Stores, Inc.*, No. 17-320, 2019 WL 3364320, at *4 (M.D. La. July 25, 2019) (deGravelles, J.) (first citing *Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998) (citation omitted) (holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment"); then citing *Porter v. Dauthier*, No. 14-41, 2015 WL 5611647, at *8, *13 (M.D. La. Sept. 23, 2015) (deGravelles, J.)). Therefore, to the extent the objective evidence in this case raises a material issue of fact for trial, the Court will consider those factual disputes in its analysis. However, the Court expects that counsel for Plaintiff will hereafter strictly comply with this Court's local rules.

### B.  Evidentiary Objections

The Court notes that both sides object to certain facts. The Court need not provide a detailed ruling on each specific objection. In some instances, the facts objected to are immaterial to the resolution of Plaintiff's claims and thus not considered in this Court's analysis. In other instances, the Court resolves the dispute in other parts of this ruling.[1] In addition, Plaintiff several times seems to object to consideration of certain facts by responding that the video is the best evidence of the events.

---

[1] For example, see this Court's reference below to *Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003), where the Sixth Circuit considered the plaintiff's appearance of impairment in its summary judgment analysis for purposes of analyzing whether an exigency existed.

At the end of the day, "the Court can still consider record evidence to determine if there is a factual dispute." *Braud*, 2019 WL 3364320, at *4 (citations omitted). The Court will do so in this case. Stated another way, the Court will review all of the evidence objectively and construe the *genuinely* disputed, legally significant facts in a light most favorable to Plaintiff.

### C.  The *Scott* Standard

Finally, in terms of preliminary issues, and before delving into the facts, the Court will address Defendants' contention that the video evidence in the record satisfies the standard set forth in *Scott v. Harris*, 550 U.S. 372 (2007), "such that plaintiff['s] version of events is 'so utterly discredited' by video evidence that no reasonable jury could have believed them." (Doc. 15-1 at 2 (quoting *Scott*, 550 U.S. at 380).) The United States Supreme Court has instructed courts that video evidence can establish that summary judgment is proper when the non-movant's version of an event is "so utterly discredited" by video evidence "that no reasonably jury could have believed him." *Scott*, 550 U.S. at 380. In other words, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* When such a situation occurs, the court should disregard the discredited facts set forth by the non-movant and instead view "the facts in the light depicted by the videotape." *Id.* at 381.

Discussing the *Scott* standard, the Fifth Circuit has explained that "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018). The video evidence presented by the parties, when compared with Plaintiff's version of events, does not meet that high bar. Specifically, it does not blatantly discredit Plaintiff's

entire version of events such that the Court should disregard Plaintiff's statement of facts altogether. And again, to the extent some of the facts asserted by Plaintiff are contradicted by the video evidence, the Court can and will consider all evidence in the record, including the videos, "to determine if there is a factual dispute." *Braud*, 2019 WL 3364320, at *4 (citations omitted). At the outset, however, the Court notes that very few—if any—legally significant facts are genuinely at issue in this case, as the video evidence captures all the events at issue.

## II.    Background

### A.  Relevant Facts

This case arises out of a dispute between Plaintiff and two police officers who were dispatched to his home to conduct a welfare check on his twelve-year-old son. The police officers involved, Kirst and Allen, were both employed by the Baton Rouge Police Department ("BRPD") on the night in question. (*Compl.* ¶ 4, Doc. 1; *Def. SUMF* ¶ 1, Doc. 15-3.) On August 23, 2020, at around 11:00 p.m., Plaintiff's ex-wife contacted the BRPD and stated that Plaintiff had taken their son's phone away from him and blocked her from the phone, thus cutting off her ability to contact her son. (*Def. SUMF* ¶ 3, Doc. 15-3; Defs. Ex. C, Recorded 911 Call at 0:20–0:28.)[2] During this phone call, she reported that Plaintiff had been "very abusive" to her and requested that law enforcement meet her at Plaintiff's home to "see if all is okay." (Defs. Ex. C, Recorded 911 Call at 0:15–0:19, 0:29–0:39.)

---

[2]     Defendants filed a motion for leave to file certain exhibits conventionally. (Doc. 18.) The Court granted the motion in part, allowing Defendants to file all video and audio recordings conventionally, which Defendants did. (*See* Notice of Conventionally Filed Documents, Doc. 22.) The conventional exhibits include: (1) Defs. Ex. C, Recorded 911 Call; (2) Defs. Ex. E, Recorded Dispatch Call to Kirst; (3) Defs. Ex. G, Bodycam Footage of Kirst; and (4) Defs. Ex. H, Bodycam Footage of Allen.

    As reflected by Plaintiff's exhibit list, (*see* Doc. 27), the evidence submitted by Plaintiff—with the exception of two exhibits—is comprised of the same exhibits previously filed by Defendants. (*Compare* Docs. 20-1 through 20-17, *with* Docs. 27-1 through 27-13; *compare* Doc. 15-1, *with* Doc. 27-3.) When referring to these duplicate exhibits, the Court will cite to the original filings only—that is, Docs. 20-1 through 20-17. Obviously, all other exhibits will be referenced by their one and only record document number. (*See, e.g.*, Docs. 27-5 and 27-9.)

However, when the dispatcher informed Officer Kirst of the 911 call, Kirst was unaware the ex-wife had only alleged Plaintiff was abusive to her. Rather, the dispatcher informed Kirst that the complainant was on the way to Plaintiff's home "to check on her twelve-year-old son" and stated that the son's "father is physically abusive." (Defs. Ex. E, Recorded Dispatch Call to Kirst at 0:11–0:21.) The dispatcher also sent a summary of this information through a "Computer Aided Dispatch" ("CAD"), which was available to both Kirst and Allen. (*See* CAD Remarks, Doc. 20-7 ("Caller is in route here to make sure her 12 [year old] son is ok. She has been blocked from his phone and caller says the father is physically abusive . . .").)

Once Officers Kirst and Allen arrived at Plaintiff's home, they announced their presence and knocked on the door. After Plaintiff answered the door, the officers explained that his ex-wife had called 911 and reported concerns regarding the wellbeing of their son. (Defs. Ex. G, Bodycam Footage of Kirst at 1:15–1:30.) Upon hearing that his ex-wife had requested a welfare check on their son, Plaintiff became extremely agitated. (*Id.* at 1:29–1:55.) He initially believed that the officers had been sent to harass him. (Sanford Depo, Doc. 20-8 at 14: 5–23, 17: 13–22, 18: 4–12.)

Plaintiff continued to express his anger with the situation for the next minute or so. (Defs. Ex. G, Bodycam Footage of Kirst at 0:15–1:54.) Subsequently, he partially turned away from the officers to return inside his home, the door to which had remained open during this entire encounter. (*Id.* at 1:53–1:54.) Kirst twice asked Plaintiff to "listen to [him]." (*Id.* at 1:51–1:54.) Seemingly in response to Kirst's requests, Plaintiff then turned partly around and said "f—k you" to the officers before stepping inside the house. (*Id.* at 1:54–1:56; Defs. Ex. H, Bodycam Footage of Allen at 0:44–0:47.) With Plaintiff standing just inside his house and the door still open, Kirst responded "you're not going to tell me f—k you" and reached across the threshold of Plaintiff's

house in an attempt to grab his arm. (Defs. Ex. H, Bodycam Footage of Allen at 0:48–0:50; Defs. Ex. G, Bodycam Footage of Kirst at 1:56–1:58.)[3]

Plaintiff then shoved Kirst in an attempt to keep him from entering. (*Def. SUMF* ¶ 10, Doc. 15-3; Defs. Ex. G, Bodycam Footage of Kirst at 1:58; Defs. Ex. H, Bodycam Footage of Allen at 0:48.) After he was shoved by Plaintiff—who was yelling that the officer was not coming into his house—Kirst stepped inside the home and a brief scuffle ensued, during which time Plaintiff punched Kirst in the face. (Defs. Ex. H, Bodycam Footage of Allen at 0:49–0:54.) The video evidence is unclear as to whether Kirst then punched Plaintiff, but Kirst admits as much in his deposition testimony. (Kirst Depo, Doc. 20-1 at 47: 19–21 (answering yes when asked if he punched Sanford while he was in the house).) After approximately four or five seconds of Plaintiff and Kirst fighting in the home, Allen—standing a foot or so outside of the house—tased Plaintiff to gain compliance.[4] (Defs. Ex. H, Bodycam Footage of Allen at 0:55–0:57; *see Def. SUMF* ¶ 13, Doc. 15-3.)

Once restrained, Plaintiff was arrested for resisting an officer with force or violence. (Kirst Depo, Doc. 20-1 at 40: 7–10; 19th JDC Minute Entry, Doc. 20-3.) He was then briefly frisked and

---

[3] The parties' versions of the facts are particularly vague regarding whether Kirst's arm actually entered Plaintiff's home at this time. (*See Def. SUMF* ¶ 10, Doc. 15-3 (stating "Kirst attempted to grab Mr. Sanford's forearm at the threshold of the residence . . ."); *see also Pl. OSMF* ¶ 10, Doc. 25-1 (responding, "The video is the best evidence of what happened.").) The Court has reviewed the video evidence and finds that it shows Kirst's arm entering the home— that is, crossing the threshold at the door—before Kirst was shoved. Allen's deposition testimony further supports this conclusion. (*See* Allen Depo, Doc. 20-5 at 44: 7–9 ("When Kirst got pushed, he went inside the house. Sticking your arm inside somebody's house, that's in the house?").)

[4] The Court notes that in Defendants' statement of uncontested material facts, they state that after "Officer Allen attempted to use his BRPD issued TASER to make Sanford stop fighting," (*Def. SUMF* ¶ 12, Doc. 15-3), "Sanford was taken to the floor inside his home, where Officer Kirst was able to use his TASER on Sanford's bare calf to gain compliance[,]" (*id.* ¶ 13). Plaintiff does not dispute that Kirst tased him in his opposing statement of material facts. (*Pl. OSMF* ¶ 13, Doc. 25-1.) However, as to the statement that *Kirst* tased Plaintiff, the Court assumes this was a mistake and that Allen's name was instead intended here, primarily because nowhere in the *Complaint*, Plaintiff's opposition brief, or the depositions of Kirst or Allen, is there any mention of Kirst tasing Plaintiff. Rather, every mention of a taser in those documents involves Allen tasing Plaintiff. (*Compl.* ¶¶ 12, 28, 30, Doc. 1; Doc. 25 at 2, 6, 10; Kirst Depo, Doc. 20-1 at 38: 25, 39: 1–3; Allen Depo, Doc. 20-5 at 34: 23–25, 35: 19–20, 44: 1–3, 46: 13–15, 47: 19–20, 60: 1–3.)

placed in the back of Kirst's police unit and emergency medical service ("EMS") was summoned to the scene to remove the taser prongs from Plaintiff's body. (*Def. SUMF* ¶¶ 14–15, Doc. 15-3.) Approximately twenty minutes later, the police unit's doors were opened and EMS briefly spoke to Plaintiff and offered to remove the taser prongs, but Plaintiff declined. (Defs. Ex. G, Bodycam Footage of Kirst at 23:13–23:47.) After speaking with EMS, Plaintiff stood up outside of the police unit—with his hands still handcuffed behind his back—while Kirst attempted to place "leg irons" or shackles on his ankles. (*Id.* at 25:57–26:18; *Def. SUMF* ¶ 17, Doc. 15-3.)

The parties' versions of the facts differ on whether Plaintiff attempted to prevent Kirst from placing the leg shackles on his ankles. According to Defendants, while Kirst attempted to shackle Plaintiff's ankles, Plaintiff "widened his stance to prevent being restrained, then turned towards the front of the vehicle" in what appeared to be an attempt to flee, "so Officer Kirst took Plaintiff to the ground." (*Def. SUMF* ¶ 17, Doc. 15-3.) Plaintiff, on the other hand, contends that he was not attempting to prevent Kirst from restraining him, but instead "made a reflex movement when the shackles were being put on his legs," after which Kirst drove him into the concrete. (*Pl. OSMF* ¶ 17, Doc. 25-1 (citing Kirst Depo, Doc. 20-1 at 39: 4–22).) The Court addresses the significance of this dispute further below.[5]

The Court notes, however, that while Plaintiff cites Kirst's deposition transcript as supporting Plaintiff's version, the portion relied upon does not support Plaintiff's contention that—in widening his stance—he was not resisting but rather made a reflex movement; in fact, it provides nothing about Plaintiff's leg movement at all. (*See* Kirst Depo, Doc. 20-1 at 39: 4–22 (Kirst explaining that he pinned Plaintiff to the ground and that, because Plaintiff's hands were handcuffed behind his back, Plaintiff had no way to break his fall).) In contrast, Defendants cite to

---

[5] *See infra*, Section IV., E., 3.

body camera footage of both officers as well as Kirst's deposition, during which Kirst stated that he "took [Plaintiff] down" because he believed Plaintiff was resisting his attempt to shackle his ankles and Plaintiff had turned his body and appeared to be trying to move towards the front of the police unit. (*See id.* at 67: 11–19; *see also id.* at 68: 16–17 (when asked whether he believed Plaintiff was trying to escape, Kirst answered "Yes, he was trying to escape.").)

Following the takedown, EMS removed the taser prongs from Plaintiff's body while he remained pinned to the ground. (*Def. SUMF* ¶ 18, Doc. 15-3.) Due to the injuries Plaintiff sustained, he was transported to Our Lady of the Lake North, (*id.* ¶ 19), in Kirst's police unit instead of an ambulance, (Kirst Depo, Doc. 20-1 at 55: 12–16). Kirst, with Plaintiff in the car, departed for the hospital approximately twenty-five minutes after the leg-shackle encounter, and they arrived at Our Lady of the Lake North around ten minutes later. (Defs. Ex. G, Bodycam Footage of Kirst at 53:00–1:04:16.) Thereafter, "[t]he medical professionals at Our Lady of the Lake North determined that Sanford should be transferred to Our Lady of the Lake on Essen Lane[.]" (*Def. SUMF* ¶ 20, Doc. 15-3; *see* Kirst Depo, Doc. 20-1 at 51: 15–22 (explaining that the hospital told him they found Plaintiff "had a broken rib and transferred him to the main campus.").) Plaintiff was transported to the second hospital by ambulance. (Sanford Depo, Doc. 20-8 at 20: 3–4.)

According to Plaintiff, by initially transporting him to Our Lady of the Lake North, Kirst brought him to the "wrong hospital[,]" as the severity of his injuries required treatment at a trauma center, which Our Lady of the Lake North does not have. (*Id.* at 18: 22–25). Defendants, in contrast, claim that the decision to transport Plaintiff to Our Lady of the Lake North is consistent with "BRPD procedure." (*Def. SUMF* ¶ 19, Doc. 15-3 (citing, *inter alia*, Kirst Depo, Doc. 20-1 at 51: 1–11 (when asked why Kirst brought Plaintiff to the first hospital, he responded, "That's where

we generally take prisoners.")).) Following Plaintiff's transfer to Our Lady of the Lake on Essen

Lane, the officers kept him handcuffed to his bed until he was later released and booked. (Sanford

Depo, Doc. 20-8 at 20: 5–16, 21: 1–2.)

### B. Summary of Plaintiff's Claims

On June 16, 2021, Plaintiff filed this civil action against Kirst, Allen, and the City, alleging

numerous violations of state and federal law. (*See Compl.*, Doc. 1.) He sues Kirst and Allen in

their individual capacities and seeks to hold the City liable based on vicarious liability, as Kirst

and Allen were employed by the City at the time of the subject events. (*Id.* ¶ 4 (alleging that the

City is vicariously liable for the state law delictual actions of its employees).) He brings this suit

individually and on behalf of his minor son, J.S., seeking damages for the severe mental anguish

and emotional injuries incurred by J.S.[6] (*Id.* ¶ 1.)

Plaintiff asserts claims under 42 U.S.C. § 1983 for the following constitutional violations:

(1) retaliation for speech protected by the First Amendment against Kirst and Allen[7]; (2) false

arrest in violation of the Fourth Amendment against Kirst only; (3) illegal entry into his home in

violation of the Fourth Amendment against Kirst and Allen; (4) excessive force in violation of the

Fourth Amendment against Kirst and Allen; and (5) denial and delay of medical treatment[8] in

violation of the Fourteenth Amendment against Kirst and Allen. (*Id.* ¶¶ 22–28.) Plaintiff brings

---

[6] As Plaintiff's son is still a minor, only his initials will be included. *See* Fed. R. Civ. P. 5.2(a)(3).

[7] It is unclear whether Plaintiff asserts a First Amendment retaliation claim against Kirst and Allen or Kirst alone. The *Complaint* suggests that Plaintiff only means to hold Kirst liable for retaliation. (*See Compl.* ¶ 22, Doc. 1 (alleging that Kirst revealed his intent to retaliate against Plaintiff when he told him "[y]ou can't say f—k you to me" and approached the door).) On the other hand, Plaintiff's opposition brief indicates the claim is against both officers. (*See* Doc. 25 at 7 (arguing Plaintiff's First Amendment rights were violated "when Kirst and Allen retaliated . . .").) Out of an abundance of caution, the Court will assume that Plaintiff means to assert a claim for First Amendment retaliation against both Kirst and Allen.

[8] As discussed below, Plaintiff improperly conflates his claim for excessive force and claim for delay and denial of medical treatment. (*See Compl.* ¶ 28, Doc. 1.) In doing so, it is unclear whether he asserts the claim for denial and delay of medical treatment against Kirst and Allen or only Kirst. The Court will assume the claim is against both of them for purposes of this analysis.

the following claims under state law: (1) assault and battery against Kirst and Allen; (2) false arrest against Kirst and Allen; (3) trespass against Kirst only; (4) negligent infliction of emotional distress on behalf of his minor son, J.S., against Kirst and Allen[9]; and (5) defamation against the City. (*Id.* ¶¶ 29–32, 38, 40.) In addition, Plaintiff contends that the City is vicariously liable for the state law torts committed by Kirst and Allen in the course and scope of their employment with the BRPD. (*Id.* ¶¶ 37, 39.) Finally, Plaintiff also seeks punitive damages against Kirst and Allen as well as reasonable attorney's fees, with interest, pursuant to 42 U.S.C. § 2000, *et seq.* (*Id.* ¶¶ 35–36.)

## III.    Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not *negate* the elements of the nonmovant's case.' " *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (in turn quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019)

---

[9] Here, too, Plaintiff does not specify whether he seeks to hold one or both officers liable for damages arising from the alleged negligent infliction of emotional distress suffered by J.S. The Court assumes that Plaintiff is asserting said claim against Kirst, Allen, and—on the basis of vicarious liability—the City.

(citing *Celotex*, 477 U.S. at 323 ("we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.")). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (quoting *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (citations and internal quotations omitted).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (citing, *inter alia*, *Ragas*, 136 F.3d at 458); *see also Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## IV.   Discussion of Federal Claims

### A.  Qualified Immunity

Because Defendants invoke qualified immunity as a defense to Plaintiff's federal law claims, the Court will briefly discuss qualified immunity principles and the parties' arguments on this issue before analyzing the substance of those claims.

#### 1. Applicable Law

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' . . . it is effectively lost if a case is erroneously permitted to go to trial." *Khansari v. City of Houston*, 14 F. Supp. 3d 842, 853 (S.D. Tex. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citation omitted), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)). "The doctrine of qualified immunity was created to balance the interest of compensating persons whose federally protected rights have been violated against the fear that personal liability might inhibit public

13

officials in the discharge of their duties." *Id.* (citing *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1059 (5th Cir. 1994)).

"When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)). To successfully refute the qualified immunity defense, Plaintiff "must point to summary judgment evidence" showing both "(1) that [the officers] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.' " *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (citation omitted)).

As to the first qualified immunity prong, whether Plaintiff has demonstrated a violation of a federal constitutional or statutory right, the Court will discuss the applicable law on each of Plaintiff's federal claims below and thus need not repeat those principles here. As to the second prong, "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (internal quotation marks omitted)). "Objective reasonableness is a matter of law for the courts to decide[.]" *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (quoting *Williams v. Bramer*, 180 F.3d 699, 702 (5th Cir. 1999)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

14

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 580 U.S. at 551 (internal quotation marks omitted)). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *White*, 580 U.S. at 551 (internal quotations omitted)); *see also Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citations omitted) ("Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments . . .' "). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 580 U.S. at 552 (internal quotation marks omitted)). Even so, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779–80 (2014)).

Put another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (in turn quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 696 (quoting *Morgan*, 659 F.3d at 371–72 (internal quotation marks omitted) (in turn quoting *al-Kidd*, 563 U.S. at 742)). "Where no controlling authority specifically prohibits

a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372 (citation omitted)).

Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 2. Parties' Arguments

First, for reasons set forth more fully below, Defendants maintain that no constitutional or statutory violation occurred in this case, thus entitling them to qualified immunity on the first prong. (Doc. 15-1 at 15.) Defendants further argue that the second qualified immunity prong cannot be satisfied either, as an objectively reasonable person in the officers' shoes would not believe the actions of Kirst or Allen constituted a violation of a clearly established statutory or constitutional right. (*Id.*) Defendants emphasize that "[i]n the two minutes or so before [Plaintiff] and Kirst made physical contact," Plaintiff acted in such a way that forced Kirst and Allen "to make a series of rapid evaluations and decisions[.]" (*Id.*) According to Defendants, in "tense, uncertain, and rapidly evolving" circumstances like these, where officers must "make split-second judgments[,]" qualified immunity clearly applies. (*Id.* at 15–16 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)).)

Plaintiff responds that qualified immunity is not appropriate here. Preliminarily, the Court notes that Plaintiff's arguments concerning qualified immunity focus solely on the warrantless entry into the home; this is so because—according to Plaintiff—if the officers' entry into his home violated the Fourth Amendment, then "all the Constitutional violations that flowed from [that] original violation were [also] illegal." (Doc. 25 at 12.) Plaintiff argues that Kirst and Allen's entry into his home was a clear a violation of his rights under the Fourth Amendment, as the law is well-

settled that police cannot enter one's home absent a warrant, consent, or exigent circumstances, and none of those existed here. (*Id.* (citations omitted).) According to Plaintiff, Kirst and Allen "clearly knew or should have known that the entry into [his] home" was unlawful, as the case law involving warrantless entry into homes was settled over forty years ago in *Payton* v. *New York*, 445 U.S. 573 (1980). (*Id.*) Plaintiff specifically focuses on the purported lack of exigent circumstances here; because his arguments on this point are set forth below, the Court will not repeat them here.

**B.  Unlawful Entry into the Home**

The Court will first address Plaintiff's claim that Kirst and Allen violated the Fourth Amendment by entering his home. In sum, summary judgment is granted on this claim. For reasons explained more fully below, the Court finds that Kirst is entitled to qualified immunity. In addition, the Court finds that Allen's entry into the home was reasonable and thus did not violate the Fourth Amendment.

**1. Parties' Arguments**

Defendants argue that the officers' entry into the home here was reasonable and thus did not violate the Fourth Amendment. First, Defendants claim that "[t]he objective evidence demonstrates that Officer Kirst was engaged in a reasonable investigative detention when he" reached across the threshold of Plaintiff's home, (Doc. 15-1 at 5), as Plaintiff's "behavior gave rise to reasonable suspicion that a crime had, was being, or would be committed," (*id.* at 6). In addition, Defendants argue that "the potential threat of imminent violence towards a child, supported by readily perceived cues from [Sanford] of agitation, intoxication, and anger," created exigent circumstances that justified the officers' warrantless entry into the home here. (*Id.* at 6.) Defendants further submit that the officers "[m]oving to arrest the plaintiff by entering the home

after he battered a police officer is expressly permitted . . . as hot pursuit of a fleeing suspect (who also may be going to injure a child if left alone, or become a barricaded suspect, which creates a new and different set of safety concerns)." (*Id.* at 6–7 (citation omitted).)

As to the allegedly illegal entry into his home, Plaintiff first details his view of the law on warrantless entries by law enforcement: "The courts have recognized that exceptions to warrantless entries and searches on a residence that allow officers to enter a person's home without a warrant include the officer obtaining consent, while in hot pursuit, or under exigent circumstances." (Doc. 25 at 3.) Plaintiff correctly points out that he did not consent and further contends that neither hot pursuit nor exigent circumstances existed in this case. According to Plaintiff, exigent circumstances only exist when an especially "pressing or urgent law enforcement need" justifies warrantless entry, (*id.* at 4), such as the need to "prevent the escape of the defendant, [avoid] . . . a possible violent confrontation that could cause injury to others, [or prevent] the destruction of evidence[,]" (*id.* at 3 (citation omitted)). Moreover, this exception is limited because—in addition to exigent circumstances—the officers must also (1) have probable cause, and (2) not "be motivated by an intent to arrest and seize evidence." (*Id.* at 4 (citing *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)).)

In addition, Plaintiff states that "[t]here was no evidence at all that the minor child, J.S., was being harmed." (*Id.* (citing Kirst Depo, Doc. 20-1 at 31: 4–6, 44: 8–11).) He insists that the officers could not have had a reasonable belief that an offense had been or was being committed (probable cause) based on the information from the dispatcher because "[t]he information relayed by the ex-wife stated Mr. Sanford had been abusive, but to her, not their son, so there was no reason to believe J.S. may have been in danger." (*Id.* at 5 (citation omitted).)

Nor should Plaintiff's purported impairment be considered for assessing whether probable cause existed, as the officers "did not observe Mr. Sanford consuming alcohol and had no way of knowing in the moment, with any certainty, that Mr. Sanford was impaired." (*Id.*) With no exigent circumstances and no probable cause at a time when Plaintiff was inside his home attempting to close his door, Kirst made the "initial contact" with Plaintiff by grabbing his forearm. (*Id.* at 6.) According to Plaintiff, Kirst's statement "you can't say f—— you to me" shows that his true intent in entering the home was not to ensure the welfare of J.S., but instead to make a seizure or arrest. (*Id.*)

In reply, Defendants assert that the alleged Fourth Amendment violation based on a claim of illegal entry into the home "fall[s] apart on the question of whether Officer Kirst entered the home before or after engaging in a lawful detention of the plaintiff." (Doc. 32 at 3.) According to Defendants, both the body camera footage and Plaintiff's deposition testimony "show that Officer Kirst's effort to detain him was at the threshold of the home." (*Id.* (citing, *inter alia*, *Def. SUMF* ¶ 10, Doc. 15-3).) Defendants again re-urge their argument that Kirst was justified in preventing Plaintiff from retreating into his home because he was conducting an investigative detention and had the requisite reasonable suspicion to effect that detention. (*Id.* at 2.) Defendants contend that, based on (a) the information that Plaintiff was abusive, (b) Plaintiff's actions and demeanor while speaking to the officers, and (c) Plaintiff's "attempt to re-enter the home where a child may be endangered[,]" the officers had the requisite reasonable suspicion to briefly detain Plaintiff and prevent him from terminating the encounter by retreating into his home. (*Id.*) Thus, Defendants submit, the officers did not need probable cause to justify their actions at this point. (*Id.*)

## 2. Applicable Law

"Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Linicomn v. Hill*, 902 F.3d 529, 535 (5th Cir. 2018) (quoting *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *see Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citation and internal quotation marks omitted) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). The Supreme Court has made clear that the degree of the invasion has no bearing on the Fourth Amendment's protection of the home; in the absence of a warrant or an exception to the warrant requirement, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much[.]" *Kyllo*, 533 U.S. at 37 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)). Hence, while there are a "few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must [generally] be answered no." *Id.* at 31 (citation omitted); *see Payton*, 445 U.S. at 586 (citation omitted) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.").

However, "that presumption can be overcome." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). "For example, 'the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable.' " *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The Supreme Court has identified a few situations in which such exigent circumstances exist, one being when "the police reasonably believe that there is a

'need to assist persons [inside a home] who are seriously injured or threatened with such injury[.]' " *United States of Am. v. Brown*, 230 F. Supp. 3d 513, 522 (M.D. La. 2017) (Jackson, J.) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* at 524 (quoting *Fisher*, 558 U.S. at 47 (in turn quoting *Brigham City*, 547 U.S. at 402)).

The "emergency-aid exception" only applies if the officer has "an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." *Id.* at 524–25 (cleaned up). "If 'reasonable minds may differ[,]' the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Id.* at 525 (quoting *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997) (citation omitted)). Hence, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Linicomn*, 902 F.3d at 536 (quoting *Fisher*, 558 U.S. at 49 (internal quotation marks omitted)). That said, the burden is on the officers to prove that an exigency exists, *id.* at 537 (first citing *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); then citing *United States v. Rico*, 51 F.3d 495, 500–01 (5th Cir. 1995)), and the Fifth Circuit has consistently "declined to apply the emergency aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention[,]" *id.* at 536.

### 3. Analysis

Although the Court can address either of the two prongs of the qualified immunity analysis first, in this instance, it believes that the first prong—whether a constitutional violation occurred— merits initial consideration. *Pearson*, 555 U.S. at 236. Because the Fifth Circuit consistently analyzes "the actions of defendants individually in the qualified immunity context[,]" the Court

will examine the actions of Kirst and Allen separately. *Von Derhaar v. Stalbert*, No. 21-1653, 2022 WL 16758300, at *7 (E.D. La. Nov. 8, 2022) (quoting *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007)).

### a. Whether Officer Kirst's Entry into the Home Violated the Fourth Amendment

To determine whether Kirst committed a Fourth Amendment violation when he entered Plaintiff's home, the Court must first resolve *when* the invasion occurred. As a threshold matter, although "[t]he front porch of a private residence falls within the curtilage of the home and is therefore accorded Fourth Amendment protection. . . . [a] front porch does not necessarily enjoy the same measure of Fourth Amendment protection that a home does[.]" *State v. Brisban*, 2000-3437 (La. 2/26/02), 809 So. 2d 923, 928 (citing *State v. Deary*, 99–0627 (La. 1/28/00), 753 So. 2d 200, 201). This is because of the "almost implicit understanding and custom in this country that, in the absence of signs or warning, a residence may be approached and the occupants summoned to the door by knocking." *Id.* (quoting *Deary*, 753 So. 2d at 201 (citing *State v. Sanders*, 374 So. 2d 1186, 1189 (La. 1979))). Law enforcement officers "have the same right as other members of the public to approach the doorway of a home and see what was exposed by the owner to the view of the general populace." *Id.* (quoting *Deary*, 753 So. 2d at 201 (internal quotation omitted)). Therefore, Kirst did not commit a Fourth Amendment violation by standing on Plaintiff's front stoop to question him about the welfare of his son.

The same cannot be said, however, with respect to Kirst's attempt to grab Plaintiff's arm once Plaintiff had retreated into his home. As explained above, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' " is deemed unreasonable under the Fourth Amendment in the absence of a warrant or a permissible exception to the warrant requirement. *Kyllo*, 533 U.S. at 37 (citation omitted) (noting, for example, that "there is certainly no exception

to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor."). Although Defendants state that Kirst "attempted to grab [Plaintiff]'s forearm at the threshold of the residence," (*Def. SUMF* ¶ 10, Doc. 15-3), the video evidence shows that at the time he reached for Plaintiff, Plaintiff was clearly standing inside his house and Kirst's arm crossed the threshold of the home, (Defs. Ex. H, Bodycam Footage of Allen at 0:48–0:50; Defs. Ex. G, Bodycam Footage of Kirst at 1:56–1:58). As such, the Court finds that Kirst's entry into the home for purposes of the Fourth Amendment occurred no earlier, and no later, than the moment he attempted to grab Plaintiff's forearm. Because this entry was conducted without a warrant, it was presumptively unreasonable. *Payton*, 445 U.S. at 586 (citation omitted).

Having found that the entry by Kirst occurred when he attempted to grab Plaintiff's forearm, the Court must now determine whether Defendants have shown the existence of exigent circumstances justifying that entry. Although Defendants argue Kirst was justified in attempting to grab Plaintiff's arm as part of a lawful investigatory detention, reasonable suspicion that a crime is afoot is not a recognized exception to the requirement that officers have a warrant to enter one's home, nor is probable cause to arrest, unless the officers have both "probable cause that a crime is being committed in a home *and* there are exigent circumstances that justify a warrantless entry into the home[.]" *Brown*, 230 F. Supp. 3d at 522 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971)). Even if probable cause were sufficient to make a warrantless entry, Plaintiff did not shove and punch Kirst until *after* Kirst attempted to grab his forearm. (Defs. Ex. H, Bodycam Footage of Allen at 0:48–0:54.) Hence, the events that occurred after Kirst's initial invasion cannot be considered in the Court's analysis of whether that invasion was reasonable under the Fourth Amendment.

As to exigency, Defendants invoke the emergency-aid exception. (*See* Doc. 15-1 at 6 (arguing that exigent circumstances existed because there was a "potential threat of imminent violence towards a child" which was supported by Plaintiff's perceived "agitation, intoxication, and anger" while speaking to the officers).) Pursuant to this exception, "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury[,]' " *Fisher*, 558 U.S. at 47 (quoting *Brigham City*, 547 U.S. at 403), but they must have " 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid[,]' " *Brown*, 230 F. Supp. 3d at 524–25 (quoting *Fisher*, 558 U.S. at 47 (citations omitted)).

For example, in *Fisher* and *Brigham City*, the Supreme Court found that the officers' warrantless entry into a home was reasonable under the Fourth Amendment based on the emergency-aid exception when the officers witnessed violence occurring inside the home and observed other factors necessitating entry to provide emergency assistance. *Fisher*, 558 U.S. 45; *Brigham City*, 547 U.S. 398. In both instances, the officers were responding to a report of a disturbance at the home. *Fisher*, 558 U.S. at 45 ("complaint of a disturbance"); *Brigham City*, 547 U.S. at 406 (responding to "complaints about a loud party" at 3 o'clock in the morning). When the officers arrived, "they encountered a tumultuous situation in the house" and witnessed "violent behavior inside." *Fisher*, 558 U.S. at 48 (the officers saw the defendant "screaming and throwing things"); *see Brigham City*, 547 U.S. at 401, 406 (upon arrival, the officers heard a loud altercation occurring inside the home and, upon entering the backyard, the officers witnessed through a window a fight taking place in the kitchen, specifically, a juvenile punching an adult).

Additionally, while the officers in *Fisher* did not witness punches being thrown like the officers did in *Brigham City*, they found "found signs of a recent injury, perhaps from a car

accident, outside." *Fisher*, 558 U.S. at 48; *see id.* at 45–46 (specifically, the officers saw "a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows," as well blood on the vehicle, on clothes inside of the vehicle, and "on one of the doors to the house."). Based on the brawl that the officers witnessed inside the home, the *Brigham City* Court found that "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Brigham City*, 547 U.S. at 406. Likewise, in *Fisher*, the Supreme Court concluded that—based on the officers witnessing the defendant "screaming and throwing things" inside the home and finding evidence of injuries outside—it was "objectively reasonable [for the officers] to believe that [the defendant]'s projectiles might have a human target (perhaps a spouse or a child), or that [the defendant] would hurt himself in the course of his rage." *Fisher*, 558 U.S. at 48.

The Western District dealt with similar facts in *Drake v. Keith*, No. 13-2405, 2014 WL 1240223 (W.D. La. Feb. 14, 2014), *report and recommendation adopted as modified*, No. 13-2405, 2014 WL 1239267 (W.D. La. Mar. 25, 2014). There, the officers responded to a domestic disturbance call; upon arrival, they heard "shouting coming from inside the house" as well as "items being thrown or dropped or broken or something to that effect." *Id.* at *8. Then, "after vigorously knocking on the door, Petitioner opened the door and [the officers] could see a woman, Ms. Nave, bent over, crying, and bruised." *Id.* "Considering that the officers were responding to a domestic disturbance call, that they heard shouting and items breaking, that Petitioner appeared irate, and that Ms. Nave appeared to require immediate medical attention," the court found that the "the officers' entry, like the entry in *Brigham City*, was reasonable and lawful." *Id.* The Fifth Circuit has also found a sufficient exigency justifying a warrantless intrusion into the home when officers reasonably believed they had to enter in order to protect an occupant from inflicting

imminent injury onto himself. *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1127, 1132 (5th Cir. 2014) (where the man's nephew placed a 911 call and the officers knew that the man was suicidal, had a gun, had been drinking, and they saw him sitting inside his truck in his garage with a gun to his head).

However, as noted above, the Fifth Circuit has "declined to apply the emergency aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention." *Linicomn*, 902 F.3d at 536; *see Rice*, 770 F.3d at 1132 (citation omitted) ("While avoiding the risk of second-guessing officers' actions based on 20/20 hindsight, we must still ensure that, at the time the officer acted, there was reliable information of an 'urgent, ongoing emergency.' "). For example, in *Gates*, the court found that there were not exigent circumstances sufficient to justify social workers' warrantless entry into a home to investigate whether children were being abused and neglected. *Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 422–23 (5th Cir. 2008). The court's conclusion was based on several findings: "the alleged abuser, was not at home, so there was no immediate danger to the children[;]" the social workers entered in order to interview the children, not to guard them against immediate danger; and one of the social workers "testified that he did not witness any exigent circumstances or emergency situation at the [ ] home." *Id.* (concluding that "the facts [did] not give rise to an 'immediate danger' supporting a warrantless entry into the Gateses' house."); *see also United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (finding it unreasonable for border patrol agents to conclude that individuals they tracked to the house needed immediate aid based on footprints showing "signs of fatigue" but no evidence "of medical distress requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that the individual had to be carried or dragged.").

This Court has similarly refused to apply the emergency-aid exception in the absence of "strong evidence of an emergency at the scene or an imminent need for medical attention." *Linicomn*, 902 F.3d at 536. For example, in *Brown*, another section of this Court considered a situation in which the officers argued that their warrantless entry into the home was justified based on their belief that a person within the home needed immediate aid. *Brown*, 230 F. Supp. 3d at 522. The Court concluded that the officers' belief was not objectively reasonable for several reasons. First, the officers were informed that a domestic disturbance had taken place, but the alleged abuser was reported to be at his friend's house, and the alleged domestic disturbance had taken place elsewhere. *Id.* at 518. Thus, the officers were not dispatched to the home at issue "in response to a report of a disturbance *at that address*[.]" *Id.* at 525. Further, the Court noted that the "officers could see into the house through the carport door, but they saw no signs of a struggle, they did not observe any movement or people inside the house, and they did not hear anyone talking[.]" *Id.* (citations omitted). In other words, "there were no signs of violence at the scene, and the interior of the home appeared to be a peaceful scene." *Id.*

Most notably, in *Linicomn*, the Fifth Circuit found that exigent circumstances did not justify the officers' warrantless entry based on facts that are extremely analogous to those presented here. *Linicomn*, 902 F.3d 529. Like in this case, the officers in *Linicomn* arrived at the plaintiff's home in response to his ex-wife's 911 call concerning their children. *Id.* at 534. The plaintiff's ex-wife called the police department at 9:20 p.m. "and reported a 'disturbance' pertaining to the children at [the plaintiff]'s residence." *Id.* The officers arrived at the home to meet paramedics, firefighters, and the ex-wife outside; the ex-wife "informed the officers that her daughter was 'lethargic and sick' inside [the] house." *Id.* After the officers repeatedly called the plaintiff's cell phone and knocked at his front door for some time, the plaintiff eventually answered

27

the door and advised two of the officers, "who were standing at the threshold of the doorway, that his daughter was asleep and did not need medical assistance." *Id.*

The plaintiff "refused to allow anyone entry" unless they had a warrant, which they did not. *Id.* One of the officers, Sergeant Irizarry, then "placed his hand on [the plaintiff]'s shoulder and asked him to step aside so that paramedics could enter and verify that [his] daughter was safe." *Id.* The plaintiff pushed Irizarry's hand away, after which the other officer, Officer Hill, "clasped [his] right arm and shoulder." *Id.* Next, plaintiff "pushed Officer Hill away, retreated, and tried to close the door to the house[,]" but the officers prevented him from closing the door. *Id.* Thereafter, the plaintiff ran to the back of the house, the officers entered behind him, and eventually, "a struggle ensued." *Id.* Later, the officers spoke to the plaintiff's children, who "confirmed that they had been asleep and were not ill" and that their mother "had a history of making exaggerated claims about their welfare." *Id.*

The Fifth Circuit concluded that the officers' warrantless entry into the *Linicomn* plaintiff's home was not justified by exigent circumstances for several reasons. *Id.* at 536–37. First, the court noted that, upon speaking with the ex-wife, the officers did not ask what reason she had to believe her daughter was "lethargic and sick[.]" *Id.* at 537. In addition, as far as the officers who later entered the home were aware, the ex-wife had not alleged that the plaintiff "hurt either child or in any way caused his daughter's condition;" although the ex-wife had claimed he abused the children in an earlier 911 call that same day, the officers were not aware of that information. *Id.* Finally, the court explained that nothing about the plaintiff's behavior gave the officers further reason to

believe his "daughter's condition had devolved beyond 'lethargic and sick,' or that she needed immediate emergency aid."[10] *Id.* at 537–38.

Turning to the facts presented in this case, the Court finds that Defendants have not shown that an exigency existed that justified Kirst's warrantless entry into Plaintiff's home. *See id.* at 537 (citations omitted) (explaining that the officers have the burden of proving an exigency). Like in *Brown* and *Linicomn*, Kirst did not perceive any facts indicating that there was an ongoing emergency or that anyone in the home needed immediate medical attention. While speaking with Plaintiff, the door remained partially open, allowing Kirst to see inside the home. Defendants have not argued that Kirst witnessed a "tumultuous" situation or violence occurring in the home like the officers did in *Brigham City* and *Fisher*, nor have they argued that the officers heard shouting or items being thrown and broken like the officers did in *Drake*, 2014 WL 1240223, at *8 (where the officers additionally witnessed a woman "bent over, crying, and bruised."). The common thread shared by *Brigham City*, *Fisher*, *Rice*, and *Drake*, is that, upon arrival, the officers personally observed facts evidencing that someone inside the home needed immediate medical assistance or protection from injury.

For the emergency-aid exception to apply and thus justify Kirst's entry, he must show that he held "an objectively reasonable basis for believing" J.S. was "in need of immediate aid." *Brown*, 230 F. Supp. 3d at 524–25 (quoting *Fisher*, 558 U.S. at 47 (citations omitted)). Although Plaintiff presented as irate and impaired here, there was no other evidence on the scene indicating that an emergency was ongoing or that J.S. was in need of imminent medical assistance or protection from Plaintiff. Kirst and Allen admitted as much during their depositions. (*See* Kirst Depo, Doc. 20-1

---

[10] The plaintiff in *Linicomn* "told the officers that his daughter 'was asleep, not ill, and not in need of assistance.' " *Linicomn v. Hill*, 902 F.3d 529, 537 (5th Cir. 2018). Although the officers stated—and the plaintiff admitted—that he "appeared 'irate and upset' upon answering the door," the court found that "an appearance of anger, without more, does not establish exigency." *Id.* at 537 n.6 (citation omitted).

at 37: 12–17 (when asked if he had any evidence that the child was not safe, he answered "I had no evidence that he was safe."); Allen Depo, Doc. 20-5 at 53: 22–25 (when asked whether he had any evidence that J.S. "was in danger or being harmed[,]" he answered no).)

Although it is true that "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception[,]" the Fifth Circuit has made clear that "strong evidence of an emergency at the scene or an imminent need for medical attention" is necessary to justify warrantless entry into the home under this exception. *Linicomn*, 902 F.3d at 536 (citations and internal quotation marks omitted). Again, the burden is on the officers to show an exigency existed that justified the warrantless entry. As to Kirst's entry, Defendants have failed to satisfy this standard. Reasonable jurors could find that Kirst did not have an objectively reasonable basis for believing an exigency justified his entry into Plaintiff's home. As such, reasonable minds could find that Kirst's entry into the home violated the Fourth Amendment.

### b. Whether Officer Kirst's Entry into the Home was Objectively Unreasonable in Light of Clearly Established Law

Although reasonable minds could conclude that Kirst's entry was unreasonable and thus unlawful, the Court finds that he is nonetheless entitled to qualified immunity for this violation. On this issue, the Court finds *Linicomn*, 902 F.3d 529 instructive. As stated above, the *Linicomn* court found that the officers' entry into the home was not justified under the emergency-aid exception. *Id.* at 537–38. Despite its conclusion that the plaintiff had plausibly stated a Fourth Amendment violation based on the unlawful entry into his home, the court ultimately affirmed "the district court's decision to grant the officers' motion for judgment on the pleadings on the basis of qualified immunity." *Id.* at 539. More specifically, the Fifth Circuit found that the officers prevailed under the second prong of the qualified immunity analysis. *Id.* at 538–39.

Though *Linicomn* is remarkably similar factually, it differs from the instant case in a few critical respects. The ex-wife in *Linicomn* reported a "disturbance" at the home to the 911 dispatcher and, when speaking with the officers later, told them that her daughter was "lethargic and sick." *Id.* at 534. In contrast, here, the 911 dispatcher told Officers Kirst and Allen that Plaintiff was reported to be "physically abusive," though they were not told to whom he was abusive, and the officers did not have the chance to corroborate any information with Plaintiff's ex-wife before confronting Plaintiff, as they arrived at his home well before she did. (*Def. SUMF* ¶¶ 3, 4, Doc. 15-3; *see also* Defs. Ex. E, Recorded Dispatch Call to Kirst.) Thus, the officers here were forced to rely on the dispatch information alone, with no chance to corroborate the ex-wife's allegations. Moreover, based on the information relayed to Kirst and Allen, the situation they confronted—allegations of physical abuse—held more potential for immediate danger to J.S. and themselves than the concerns reported in *Linicomn*.

In addition, while the officers in *Linicomn* arrived as late as an hour and a half after the ex-wife placed her 911 call, Kirst and Allen arrived at Plaintiff's home closer to around twenty minutes after the 911 call was placed. (*See* Dispatch Remarks, Doc. 20-6.) Finally, although the father in *Linicomn*, like Plaintiff in this case, presented to the officers as "irate and upset" when opening the door, the Fifth Circuit found this fact insufficient to establish exigency because there were no other circumstances indicating the children were in danger or that the allegedly sick daughter needed immediate emergency assistance. *Linicomn*, 902 F.3d at 537 n.6. In contrast, here, based on this Court's review of the video evidence, all reasonable jurors would conclude that Plaintiff appeared intoxicated or otherwise impaired, acted belligerently, and used violent and profane language directed toward his ex-wife. (*See* Defs. Ex. G, Bodycam Footage of Kirst at

1:27–1:56; *see id.* at 1:50–54 (Plaintiff stating "beat that bi—s brains out and tell her to suck a d–
–k").)

In explaining that the *Linicomn* plaintiff's appearance of anger alone did not create an
exigency, the court cited for comparison a case in which the Sixth Circuit found that "the totality
of the circumstances justified entry to secure the safety of the police, paramedics, and other people
possibly inside the home where" a 911 caller reported a "cutting or stabbing" at the home, the
plaintiff "answered the door shirtless, with blood on his legs and boxer shorts[,] . . . [i]t was
apparent that [the plaintiff] himself was injured[,] . . . [he] acted belligerently and used profanity[,]
. . . [and] [h]e appeared intoxicated." *Linicomn*, 902 F.3d at 537 n.6 (quoting *Thacker v. City of
Columbus*, 328 F.3d 244, 254 (6th Cir. 2003) (affirming the district court's decision to grant
summary judgment for the defendants)). Because Kirst and Allen were conducting a welfare check
on a child whose father was reported to be physically abusive, whereas the officers in *Linicomn*
were unaware of any claims of abuse or specific wrongdoing by the father, the fact that Plaintiff
presented to the officers as belligerent and impaired has more significance to Kirst's assessment
of the situation than the mere anger exhibited by the plaintiff in *Linicomn*.

Plaintiff argues that the officers could not have had a reasonable belief that an offense had
been or was being committed (probable cause) based on the information from the dispatcher
because "[t]he information relayed by the ex-wife stated Mr. Sanford had been abusive, but to her,
not to their son, so there was no reason to believe J.S. may have been in danger." (Doc. 25 at 5
(citation omitted).) Although it is true that Plaintiff's ex-wife told the 911 dispatcher that Plaintiff
had been "very abusive" to her, (Defs. Ex. C, Recorded 911 Call at 0:16–0:19), the information
relayed to Kirst was that J.S.'s "father is physically abusive," (Defs. Ex. E, Recorded Dispatch
Call to Kirst at 0:11–21; *see also* CAD Remarks, Doc. 20-7 at 1 ("Caller is in route here to make

sure her 12 [year old] son is ok. She has been blocked from his phone and caller says the father is physically abusive…")). Thus, based on the information Kirst was made aware of, it was reasonable to assume that Plaintiff was reported to be abusive to J.S.

To conclude, *Linicomn* is certainly pertinent to the issue of whether exigent circumstances existed in this case. But, to overcome qualified immunity and thus defeat summary judgment, Plaintiff must show that "*all* reasonable officials in the [officers'] circumstances would have then known that [their] conduct violated the United States Constitution." *Linicomn*, 902 F.3d at 538–39 (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001)). To say *all* reasonable officials in Kirst's position would have known that (a) he entered the home when he reached his arm inside, and (2) it was clearly established that the circumstances in this case did not create an exigency, the Court "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *McLin*, 866 F.3d at 696 (quoting *Morgan*, 659 F.3d at 371–72 (internal quotation marks omitted) (in turn quoting *al-Kidd*, 563 U.S. at 742)). Neither *Linicomn* nor any case Plaintiff has cited "defines the contours of the right in question with a high degree of particularity." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013) (citation omitted). Thus, Plaintiff has failed to establish that every officer in Kirst's position would have known, beyond debate, that his conduct was unreasonable in light of clearly established law. Consequently, the Court finds that Kirst is entitled to qualified immunity on this claim. Summary judgment will be entered accordingly.

### c. Whether Officer Allen's Entry into the Home Violated the Fourth Amendment

The Court now addresses Allen's entry into Plaintiff's house. At the time that Allen entered the home, he had already witnessed the following events: Kirst entering the home, Plaintiff shoving and then punching Kirst in the face, and Plaintiff and Kirst continuing to struggle as Kirst

attempted to gain compliance. (*See* Defs. Ex. H, Bodycam Footage of Allen at 0:48–1:10.) Further, the video evidence shows that before Allen entered, he had already tased Plaintiff in an apparent attempt to stop him from resisting. (*Id.*) Because Allen personally witnessed Plaintiff's use of violence against Kirst, he clearly had evidence of an "urgent, ongoing emergency" occurring inside the house. *Rice*, 770 F.3d at 1132. Thus, as to Allen's entry, the Court finds that Defendants have shown the existence of an exigency that made his entry reasonable under the Fourth Amendment. A reasonable jury could not conclude that Allen lacked "an objectively reasonable basis for believing" that "persons were in danger" inside the home. *Fisher*, 558 U.S. at 49 (citations omitted). Accordingly, the Court need not consider the second prong of the qualified immunity analysis with respect to Allen's entry; summary judgment is granted on this issue.

### C.  First Amendment Retaliation

The Court next turns to Plaintiff's claim that the officers retaliated against him for exercising his right to free speech under the First Amendment.

### 1. Parties' Arguments

Defendants contend that summary judgment on the First Amendment retaliation claim is appropriate for several reasons. Defendants argue that the reason Kirst made the initial contact with Plaintiff—the "contact" being his reaching across the threshold of the door to his home and grabbing Plaintiff's forearm—was not to retaliate against him for his protected speech (saying "f––k you"). (Doc. 15-1 at 3.) Rather, Kirst tried to grab Plaintiff because he was not finished with his investigation, he "felt a need to conduct an investigative detention[,]" and Plaintiff was trying to end the encounter. (*Id.* (citing Kirst Depo, 32: 13–17, 46: 2–21, Doc. 20-1).) Further, Defendants contend that this investigative detention was lawful because it was supported by reasonable suspicion; specifically, they argue Kirst developed a reasonable suspicion that Plaintiff may be

abusing his child because (a) he was responding to a request for a welfare check to ascertain the safety of the child, (b) he had previously been advised that the caller reported "the father is physically abusive," and (c) upon arrival, he was confronted by a man who was over six feet tall, weighed 270 pounds, and appeared impaired and aggressive. (*Id.* (citations omitted).)

Moreover, to the extent Plaintiff claims his *arrest* was in retaliation for his protected speech, Defendants argue that individuals asserting a claim for retaliatory arrest in violation of the First Amendment must additionally "show that the arresting officer lacked probable cause for the arrest . . ." (*Id.* at 2 (citations omitted).) Here, Defendants state, the officers clearly had probable cause to arrest Plaintiff after he shoved Kirst and punched Kirst in the face; thus, Kirst did not retaliate against Plaintiff in violation of the First Amendment. (*Id.* at 4.)

In his opposition brief, Plaintiff does not point the Court to any law applicable to his First Amendment retaliation claim. Instead, Plaintiff sums up his position on this claim by drawing the following analogy:

> In the movie, Duck Soup (1933), Groucho Marx was caught in the act of adultery by his wife, who caught him in the family bed. When accused of infidelity, Groucho quipped "Who you gonna believe, me [or] your own eyes?" The City makes the same incredulous statement when it tells the Court to ignore its eyes and ears on what Kirst actually said after being cursed and offers a different rationale. At the very least, the reason for bursting into Sanford's home is a jury question. Sanford has the right of Free Speech, and the City acknowledges that in its corporate deposition. Clearly, the police violated Sanford's First Amendment Right when Kirst and Allen retaliated for Sanford's curse of Kirst by forcing their way into his home and beating, tasing and arresting him.

(Doc. 25 at 7 (citations omitted).)

In reply, Defendants re-urge their argument that Plaintiff's retaliation claim fails because Kirst and Allen had reasonable suspicion to briefly detain him for investigatory purposes. (Doc. 32 at 1.) Relying on *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), Defendants again submit that

"where a plaintiff claims that he was detained in retaliation for his speech, he needs to show not only that the official acted with a retaliatory motive and that the plaintiff was injured, but also that the motive was a 'but-for' cause of the injury." (Doc. 32 at 1.) According to Defendants, the deposition testimony of Kirst and the 30(b)(6) BRPD deponents as well as the objective evidence all serve as proof that Kirst and Allen were attempting to engage in a lawful investigative detention—and later, an arrest—of Plaintiff, not to retaliate against him for exercising his right to engage in free speech. (*Id.*)

### 2. Applicable Law

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves*, 139 S. Ct. at 1722 (cleaned up). Individuals injured by this form of retaliation "may generally seek relief by bringing a First Amendment claim." *Id.* (citations omitted). As the Fifth Circuit has explained, "[t]o prevail on a First Amendment retaliation claim, Plaintiff must demonstrate that (1) he was engaged in constitutionally protected activity, (2) the officers' action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the officers' adverse actions were substantially motivated against Plaintiff's exercise of constitutionally protected conduct." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017) (citation omitted).

"However, a retaliation claim is only applicable 'when non-retaliatory grounds are in fact insufficient to provoke the adverse consequences.'" *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Consequently, "even where a citizen believes that he has been subject to a retaliatory detention or arrest, if there was reasonable suspicion or probable cause for an officer to seize the citizen, 'the objectives of law enforcement

36

take primacy over the citizen's right to avoid retaliation.' " *Id.* at 244–45 (quoting *Keenan v. Tejeda*, 290 F.3d 252, 261–62 (5th Cir. 2002)).

### 3. Analysis

For the following reasons, the Court finds that Kirst and Allen are entitled to qualified immunity on the First Amendment retaliation claim. In sum, even if reasonable jurors could conclude that the officers committed a constitutional violation here, the Court finds that the law did not "so clearly and unambiguously" prohibit their conduct such "that *every* reasonable official" in their shoes would have understood that they were violating the law. *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citations and internal quotation marks omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . ."). Accordingly, the Court will grant summary judgment on this issue.

The actions of Kirst and Allen will be examined individually for purposes of determining qualified immunity. *See Von Derhaar v. Stalbert*, No. 21-1653, 2022 WL 16758300, at *7 (E.D. La. Nov. 8, 2022) (quoting *Meadours v. Ermel,* 483 F.3d 417, 421 (5th Cir. 2007)) (the Fifth Circuit consistently analyzes "the actions of defendants individually in the qualified immunity context"). In examining the actions of both officers here, the pertinent question is whether, in light of clearly established law, it was objectively unreasonable for them to believe that sufficient, "non-retaliatory grounds" existed that justified their adverse actions. *Allen*, 815 F.3d at 244 (citation omitted). If non-retaliatory grounds sufficient to provoke Kirst and Allen's actions existed here, then Plaintiff's retaliation claim must fail. *See id.* (citation omitted).

### a. Whether It was Objectively Unreasonable for Officer Kirst to Believe "Non-Retaliatory" Grounds Justified His Actions

Plaintiff's position is that, after he cursed at Kirst, Kirst revealed his intention to retaliate against Plaintiff by responding "[y]ou can't say f—k you to me" before he attempted to grab Plaintiff's forearm. (*Compl.* ¶ 22, Doc. 1.) Thereafter, Plaintiff argues that Kirst retaliated against him for this protected speech by forcing his way into his home and then beating and arresting him. (Doc. 25 at 7.) Defendants respond that these actions were justified on non-retaliatory grounds. More specifically, Defendants first submit that Kirst's act of reaching across the threshold of Plaintiff's home to grab his forearm was part of a lawful investigatory detention, and that detention was justified by the officers' reasonable suspicion that J.S. may be in danger. (Doc. 15-1 at 3.) Right after this initial physical contact, Plaintiff shoved and then punched Kirst—acts which Defendants claim gave Kirst probable cause to arrest.

Where a claim for retaliatory arrest is asserted, police officers are "entitled to qualified immunity unless there was no actual probable cause for the arrest *and* the officers were objectively unreasonable in believing there was probable cause for the arrest." *Davidson*, 848 F.3d at 391 (emphasis added) (citation omitted). "A government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Carroll*, 800 F.3d at 169 (citing *Thompson*, 245 F.3d at 457).

The Court begins with the first act that initiated the fight between Plaintiff and the officers: Kirst's attempt to grab Plaintiff's forearm at the threshold of the residence. For reasons already discussed, the Court finds that Kirst was not objectively unreasonable, in light of clearly established law, in believing that his entry into the home at this point was justified by exigent

circumstances.[11] Nor was Kirst objectively unreasonable in believing that his actions after that point were justified by sufficient, non-retaliatory grounds. After the initial entry, Plaintiff shoved and struck Kirst; thereafter, Kirst and Plaintiff fought each other as Kirst attempted to restrain Plaintiff. (Defs. Ex. H, Bodycam Footage of Allen at 0:48–0:54.)

Eventually, after Allen tased Plaintiff, Kirst was able to pin Plaintiff to the ground to effectuate a formal arrest. (*Id.* at 0:54–1:40.) As explained in more detail below regarding the false arrest claim[12], Plaintiff has failed to establish that the law was clearly established such that every reasonable officer in Kirst's position would have known, beyond debate, that he lacked probable cause to arrest Plaintiff after Plaintiff shoved him and then struck him in the face. Plaintiff has not pointed this Court to any case in which a court found that a police officer retaliated against an individual in violation of the First Amendment based on similar facts. Therefore, Plaintiff has failed to meet his burden of showing it was objectively unreasonable, in light of clearly established law, for Kirst to believe that his actions were justified by sufficient, non-retaliatory grounds. Accordingly, Kirst is entitled to qualified immunity on this claim.

### b. Whether It was Objectively Unreasonable for Officer Allen to Believe "Non-Retaliatory" Grounds Justified His Actions

Plaintiff's claim against Allen for retaliation in violation of the First Amendment fails for some of the same reasons. At the time that Allen tased Plaintiff, he had already witnessed Plaintiff shove and then punch Kirst. (*Id.* at 0:48–1:10.) Allen decided to tase Plaintiff at a time during which Plaintiff was still resisting Kirst's attempts to restrain him. (*Id.*) Plaintiff has not shown that it was objectively unreasonable, in light of clearly established law, for Allen to believe that sufficient, non-retaliatory grounds existed that justified both his use of a taser and the formal arrest

---

[11] *See supra*, Section IV., B., 3., b.
[12] *See infra*, Section IV., D., 3.

of Plaintiff.[13] Accordingly, Allen is entitled to qualified immunity on the First Amendment retaliation claim. Because both officers are entitled to qualified immunity here, the *Motion* will be granted on this claim.

### D. False Arrest

The Court next considers the claim against Kirst for false arrest in violation of the Fourth Amendment. (*See Compl.* ¶ 23, Doc. 1 (alleging that "Kirst arrested Sanford without probable cause and jailed him illegally, committing an illegal seizure of his person . . .").) For the following reasons, the Court finds that summary judgment is warranted on this issue because Kirst is entitled to qualified immunity.

### 1. Parties' Arguments

Defendants argue they are entitled to summary judgment on the false arrest claim under 42 U.S.C. § 1983, as claims for false arrest and detention turn on the issue of probable cause, and probable cause to arrest clearly existed in this case. (Doc. 15-1 at 4–5.) Defendants reiterate the following facts: (a) by attempting to keep Plaintiff from retreating into his home, the officers were simply carrying out a lawful investigatory detention; and (b) in effecting that detention, Kirst was shoved and then punched by Plaintiff, which gave the officers probable cause to arrest him. (*Id.* at 5.) Thus, Defendants contend, probable cause to arrest here "was satisfied by Sanford's violence towards [Kirst], and confirmed by the District Attorney filing formal charges." (*Id.*)

In opposition, Plaintiff first asserts that if the officers' entry into his home was illegal, then any violence or arrest that follows is a continuation of that illegal action and thus is likewise illegal. (Doc. 25 at 7 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963) and analogizing "to the criminal doctrine of 'fruit of the poisonous tree.' ").) Thereafter, Plaintiff repeats why the entry

---

[13] The Court further addresses Allen's use of a taser to gain Plaintiff's compliance in its discussion of the excessive force claim. *See infra*, Section IV., E., 3.

here was unlawful. According to Plaintiff, any action he took against Kirst here was in "reasonable defense of his property" under La. R.S. 14:19. (*Id.*) He further claims that the officers lacked probable cause to arrest him, and thus their entry into his home was illegal. (*Id.* at 8.)

In reply, Defendants assert that the alleged Fourth Amendment violation based on a claim of false arrest "fall[s] apart on the question of whether Officer Kirst entered the home before or after engaging in a lawful detention of the plaintiff." (Doc. 32 at 3.) According to Defendants, both the objective evidence—including the body camera footage—and Plaintiff's deposition testimony "show that Officer Kirst's effort to detain him was at the threshold of the home." (*Id.* (citing *Def. SUMF* ¶ 10, Doc. 15-3).) Defendants do not provide more argument on this point in their reply brief, but they seem to be suggesting that his false arrest claim fails because (a) the initial purported seizure, Kirst grabbing Plaintiff's forearm at the threshold of the home, was part of a lawful investigative detention, and (b) the formal arrest that followed was supported by probable cause because after the initial entry, Plaintiff battered Kirst.

### 2. Applicable Law

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (quoting U.S. Const. amend. IV). "A warrantless arrest by a law officer is unreasonable under the Fourth Amendment if 'there is no probable cause to believe that a crime has been or is being committed.' " *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 361 (M.D. La. 2022) (deGravelles, J.) (quoting *Devenpeck*, 543 U.S. at 152 (citations omitted)). Probable cause "exists when the totality of the facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed

or was committing an offense." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001) (cleaned up).

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152 (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id.* at 153 (citations omitted). "That is to say, [the officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* "The 'constitutional torts' of false arrest, unreasonable seizure, and false imprisonment [ ] require a showing of no probable cause." *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).

### 3. Analysis

As explained below, Plaintiff failed to establish that every officer in Kirst's position would have known, beyond debate, that his arrest of Plaintiff was unlawful in light of clearly established law. Given this conclusion, the Court need not address whether Plaintiff has shown a Fourth Amendment violation based on the lawfulness of his arrest. *See Pearson*, 555 U.S. at 236 (explaining that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

The question of whether Kirst is entitled to qualified immunity on the false arrest claim hinges solely on whether the law so clearly and unambiguously prohibited Kirst's conduct such that all reasonable officials in his position would have known they lacked probable cause to believe Plaintiff was guilty of the crime charged—in this case, resisting a police officer with force or violence in violation of La. R.S. § 14:108.2. Section 108.2(A) defines that offense as follows:

A. Resisting a police officer with force or violence is any of the following when the offender has reasonable grounds to believe the victim is a police officer who is arresting, detaining, seizing property, serving process, or is otherwise acting in the performance of his official duty:

(1) Using threatening force or violence by one sought to be arrested or detained before the arresting officer can restrain him and after notice is given that he is under arrest or detention.

(2) Using threatening force or violence toward or any resistance or opposition using force or violence to the arresting officer after the arrested party is actually placed under arrest and before he is incarcerated in jail.

(3) Injuring or attempting to injure a police officer engaged in the performance of his duties as a police officer.

(4) Using or threatening force or violence toward a police officer performing any official duty.

La. R.S. § 14:108.2(A).

Turning to the facts at hand, at the moment Plaintiff shoved Kirst, it was objectively reasonable for Kirst to believe that Plaintiff had violated La. R.S. § 14:108.2(A)(4) by using "force" toward a police officer performing an official duty, as Kirst was conducting a welfare check on a child. Although Plaintiff contends that his use of force against Kirst was justified as "reasonable defense of his property" pursuant to La. R.S. 14:19, (Doc. 25 at 7), thereby suggesting that he was *in fact* not guilty of the crime charged, he does not explain what role said defense should play in the analysis of whether Kirst had probable cause *to believe* he had committed a crime.

Further, even if Kirst lacked probable cause to arrest Plaintiff—a finding the Court does not make today—Plaintiff has not shown that "the law so clearly and unambiguously prohibited [Kirst's] conduct [such] that '*every reasonable official* would understand that what he [was] doing violate[d] [the law].' " *McLin*, 866 F.3d at 695 (emphasis added) (citing *Morgan*, 659 F.3d at 371

43

(en banc) (in turn quoting *al-Kidd*, 563 U.S. at 741)). Again, the burden is on Plaintiff to demonstrate that qualified immunity does not apply, *Carroll*, 800 F.3d at 169 (citation omitted), and Plaintiff has not cited any case where an officer's arrest was deemed unlawful based on similar facts. To show Kirst had sufficient notice that he was committing a constitutional violation, the Court "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a *high degree of particularity*." *McLin*, 866 F.3d at 696 (emphasis added) (quoting *Morgan*, 659 F.3d at 371–72 (internal quotation marks omitted) (in turn quoting *al-Kidd*, 563 U.S. at 742)).

Considering the highly specific factual scenario presented in this case, "the right in question" has only been defined "with a high degree of particularity" if Plaintiff can point to jurisprudence demonstrating that: (a) an officer reaching his arm inside an individual's home is an illegal entry; and (b) if the individual uses force against that officer to defend his property from an illegal entry, a reasonable person in that officer's position would conclude that the individual had *not* committed the offense charged—here, resisting an officer with force or violence. Plaintiff has not pointed to, nor has the Court located, any case bearing roughly analogous facts. Thus, Plaintiff has not met his burden of showing that Kirst's conduct was prohibited by "clearly established law" at the time in question.

Moreover, as explained above, Kirst is entitled to qualified immunity on the Fourth Amendment claim for unlawful entry. More specifically, the Court found that Plaintiff failed to show Kirst was objectively unreasonable under clearly established law in believing his entry into the home was permitted based on exigency. If Kirst was not objectively unreasonable in believing his presence in the home was permitted, then, by extension, he could not have been objectively unreasonable in believing Plaintiff committed the crime charged when Plaintiff used force against

44

him. *Goodson*, 202 F.3d at 736 (citation omitted) ("Objective reasonableness is a matter of law for the courts to decide[.]"). Accordingly, the Court finds that Kirst is entitled to qualified immunity on the false arrest claim. As a result, summary judgment is granted on this issue.

### E. Excessive Force[14]

The Court now turns to Plaintiff's claim that Kirst and Allen violated his Fourth Amendment right to be free from excessive force. Plaintiff specifically alleges that the officers used excessive force when Allen tased him "without justification" and when Kirst took him down to the ground and pinned him there while he was handcuffed, which resulted in "six broken ribs and a punctured lung." (*Compl.* ¶ 28, Doc. 1.) As explained below, the Court will grant the *Motion* with respect to the excessive force claim because it finds that Plaintiff has not shown a constitutional violation based on excessive force.

### 1. Parties' Arguments

Defendants bifurcate their analysis of the excessive force claim based on their view of the facts, which involved "effectively two encounters between plaintiff and the officers." (Doc. 15-1 at 8.) The first encounter occurred at the threshold of the home and in the living room and lasted "roughly three minutes, from the knock on the door to [Plaintiff] being handcuffed." (*Id.*) The second encounter took place "roughly twenty minutes after the knock on the door" when Kirst attempted to shackle Plaintiff's ankles and—in Defendant's view—Plaintiff attempted to avoid having his legs shackled and started moving away from the officers. (*Id.*)

Defendants seem to only contest whether the force used by the officers was clearly unreasonable under the circumstances. As to the first encounter, Defendants explain that when the

---

[14] Plaintiff's "excessive force claim is separate and distinct from [his] unlawful arrest claim, and [the Court] must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) (citations omitted).

fight ensued between Kirst and Plaintiff, both Kirst and Plaintiff threw punches, and Plaintiff was tased multiple times in an attempt "to get him to stop fighting." (*Id.*) Defendants argue that the force used during this encounter was not clearly unreasonable:

> What is notable is that neither Kirst nor Allen shot Sanford, did not use batons, and the fighting, such as it was, lasted for roughly one minute. Mr. Sanford is a big man by any measure, he had already been combative with the police, the officers had no way of knowing what kind of weapons he could produce if allowed to flee into the household, or what kind of revenge he might take against them, or against his ex-wife, either personally or through the proxy of the child. Defendants suggest that they showed commendable restraint in handling this situation.

(*Id.*)

Defendants contend that the second encounter, which occurred later by the police unit, "was even briefer" and involved "less contact[.]" (*Id.* at 9.) According to Defendants, while Kirst was attempting to shackle Plaintiff's ankles, Plaintiff avoided being shackled, turned, and started moving toward the front of the car, after which Kirst, "to prevent his escape or resistance[,] . . . used a standard takedown" by forcing him to the ground. (*Id.* (citing Kirst Depo, 67: 11–69: 2, Doc. 20-1; *Def. SUMF* ¶¶ 16–17, Doc. 15-3).) Defendants argue that the injuries Plaintiff sustained from this takedown were caused "solely as a result of his resisting the officers' reasonable efforts to restrain him[.]" (*Id.*) Thus, Defendants contend, the amount of force used in the second encounter was also reasonable and, as a result, Plaintiff's excessive force claim fails.

Regarding his excessive force claim, Plaintiff first turns to the scuffle that occurred in his home. (Doc. 25 at 4.) He argues that in using force against Kirst, he was exercising his right to resist an illegal arrest under Louisiana law. (*Id.* (citing *State v. Ceaser*, 2002-3021 (La. 10/21/03), 859 So. 2d 639).) Plaintiff also states that abusive words such as "f—you" directed at a police officer do not justify an arrest for resisting an officer or for any other crime. (*Id.* (citations

omitted).) Plaintiff submits that the force he used against the officers in this case was reasonable, whereas the force used against him was not, as he was punched, tasered, and placed in handcuffs simply for retreating into his own home. (*Id.* at 6.)

As to the second encounter, which occurred while Plaintiff stood handcuffed by the police unit, Plaintiff argues that while Kirst was attempting to shackle his ankles, "the video shows [he] instinctively widened his stance" in an effort to move his feet apart because he is a tall man. (*Id.* at 8 (citation omitted).) In response to Plaintiff's movements, "Kirst then took [him] down on the concrete driveway, driving his shoulder into [Plaintiff]'s right side rib cage, even though Kirst knew" that Plaintiff, being handcuffed behind his back, would have no way to break his fall. (*Id.* (citing Kirst Depo, 39: 10–19, Doc. 20-1).) Plaintiff suffered serious injuries as a result of these encounters, including six fractures to his ribs in twenty-three places and a punctured lung that required pneumothorax surgery. (*Id.*)

## 2. Applicable Law

To establish an excessive force claim under the Fourth Amendment, a plaintiff must show: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). "Crucially," whether the excessiveness of the force was clearly unreasonable is an objective inquiry: "the question is whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him], without regard to their underlying intent or motivation." *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021) (cleaned up).

With respect to the first element, "the plaintiff's asserted injury must be more than *de minimis*." *Freeman*, 483 F.3d at 416 (citing *Glenn*, 242 F.3d at 314). "The determination of

whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.' " *Id.* at 416–17 (first quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996); then citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than *de minimis*, we look to the context in which that force was deployed.")).[15]

As to the second element—that the injury "resulted directly and only from a use of force that was clearly excessive," *Freeman*, 483 F.3d at 416—the Fifth Circuit "distinguish[es] between injuries resulting from excessive force and those resulting from the justified use of force." *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc) (citation omitted). "A trier of the fact can compensate only for injury caused by the use of excessive force. There can be no award for injury caused by reasonable force." *Id.* However, there is no bar to "recovery for aggravation of preexisting injury caused by the use of excessive force." *Id.*

Finally, as to the third element, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Carroll*, 800 F.3d at 173–74 (quoting *Graham v. Connor*, 490 U.S. 386, 396–397 (1989)). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' "[16] *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citations omitted). The Supreme Court

---

[15] The Court will not discuss the first element at length, as it is not at issue here. For further explanation on the injury required for excessive force claims, *see Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

[16] As the Fifth Circuit noted, "[t]hese inquiries are often intertwined." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (simultaneously addressing whether the force was clearly "excessive" and clearly "unreasonable")).

has "identifie[d] several factors bearing on the reasonableness of force: with 'careful attention to the facts and circumstances of each particular case,' courts consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Cloud*, 993 F.3d at 384 (quoting *Graham*, 490 U.S. at 396). "This list is not exclusive, however, and the Court may examine the totality of the circumstances." *Drumgole v. Frumveller*, No. 14-2827, 2015 WL 2250134, at *8 (E.D. La. May 13, 2015).

### 3. Analysis

Defendants do not contest that Plaintiff suffered an injury, thus obviating the need to analyze the first element. Rather, at the heart of Defendant's *Motion* is their contention that the force used by both officers in this case was justified and not clearly unreasonable. Thus, the sole issue is whether the use of force here was clearly excessive and objectively unreasonable.

The Court will first consider Allen's use of the taser.[17] Although the Court is not limited to considering the factors listed above, all three are relevant here. At the time Allen deployed his taser, the officers were attempting to arrest Plaintiff for resisting a police officer with force or violence, as he had just shoved and punched Kirst in the face. Given the violent nature of this crime, and the fact that it was directed toward Officer Kirst, the first two enumerated factors— "the severity of the crime . . . [and] whether the suspect pose[d] an immediate threat to the safety of the officers or others"—weigh in favor of finding Allen acted reasonably. *Cloud*, 993 F.3d at 384 (quoting *Graham*, 490 U.S. at 396); *cf. Brown v. Lynch*, 524 F. App'x 69, 80 (5th Cir. 2013)

---

[17] Although Kirst also punched Plaintiff during the fight inside the house, Plaintiff does not appear to include that use of force in his excessive force claim. (*See Compl.* ¶ 28, Doc. 1 (discussing his excessive force claim and only including allegations regarding Allen's use of the taser and Kirst forcing him to the ground following the attempt to shackle his ankles); *see also* Doc. 25 at 8 (only discussing Kirst's acts of forcing him to the ground and pinning him there following the attempt to shackle his ankles for his excessive force claim in his opposition brief).) In the event Plaintiff does mean to include Kirst's act of striking him as part of his excessive force claim, that claim against Kirst would fail largely for the same reasons Allen's use of the taser was neither clearly excessive nor objectively unreasonable.

(finding the second and third factors weighed against the officers because the crime the suspect was initially detained for—selling marijuana on a prior date—was "not one to put any person in real or immediate danger. . . ." and the suspect never made any "threats, show[ed] physical aggression, or g[a]ve any other indication that he posed a safety risk or a flight risk.").

That said, the extent to which Plaintiff was "actively resisting arrest" is perhaps the most important factor here. "Faced with an uncooperative arrestee, officers properly use 'measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance.' " *Cloud*, 993 F.3d at 384 (quoting *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332–33 (5th Cir. 2020) (citations omitted)). When "the severity of [the] crime and immediate safety threat are relatively inconclusive," the Fifth Circuit has generally stated that "a suspect's active resistance to arrest may justify" the use of a taser. *Id.* at 384.

For example, in *Cloud*, the Fifth Circuit found that the officer's first use of a taser was reasonable based primarily, if not entirely, on the arrestee actively resisting arrest. *See id.* at 384–86 (describing the other two factors as "less illuminating"). There, the arrestee, Cloud, was pulled over for a minor traffic offense and refused to sign the ticket, which is a crime in Louisiana. *Id.* at 382. The officer moved to arrest Cloud and had handcuffed only "his left wrist, at which point Cloud turned partially around to his left." *Id.* The officer "ordered Cloud to turn back around and reached for his right hand to finish handcuffing him. . . [b]ut Cloud then spun all the way around, turning away from [the officer's] reach and facing him head-on, with the handcuffs hanging from his left wrist." *Id.* It was at this point that the officer "stepped a few feet back and tased Cloud in the chest." *Id.* "In other words," the court stated, "Cloud took a confrontational stance, deprived [the officer] of the use of his handcuffs, and thwarted efforts to complete the arrest." *Id.* at 386 (citing for comparison *Collier v. Montgomery*, 569 F.3d 214, 216, 219 (5th Cir. 2009) (reasonable

50

to use force on arrestee who "physically resisted when [officer] attempted to place handcuffs on him")).

Here, Kirst and Allen moved to arrest Plaintiff after he shoved Kirst. Plaintiff's resistance thereafter was certainly more pronounced than that exhibited before the officer initially tased the arrestee in *Cloud*, 993 F.3d 379. (*See* Defs. Ex. G, Bodycam Footage of Kirst at 1:57–2:03; Defs. Ex. H, Bodycam Footage of Allen at 0:49–57.) Although Plaintiff argues that, in punching Kirst, he was exercising his "right to resist an illegal arrest" under Louisiana law, (Doc. 25 at 4), that fact—even if true—has no bearing on the question of whether the force used by Allen was clearly excessive and unreasonable. As explained above[18], Plaintiff's "excessive force claim is separate and distinct from [his] unlawful arrest claim, and [the Court] must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman*, 483 F.3d at 417 (citation omitted); *see also Brown v. Lynch*, 524 F. App'x at 74, 80 (5th Cir. 2013) (considering whether and to what extent Brown resisted arrest in its analysis of the excessive force claim after having found that Brown's arrest was unlawful and after noting that individuals in Louisiana may resist an illegal arrest). Given the guidance provided by *Cloud* and the totality of the circumstances presented in this case, including Plaintiff's act of punching Kirst in the face, a reasonable jury could not conclude that Kirst was objectively unreasonable in tasing Plaintiff.

Though a closer call, the Court finds that reasonable minds also could not conclude that Kirst's decision to force Plaintiff to the ground and pin him there following attempts to shackle his ankles was both objectively unreasonable and clearly excessive under the circumstances. Plaintiff had previously been violent and extremely non-cooperative, thus making it reasonable for Kirst to believe he may have been both resisting the leg shackles and attempting to flee. *See Cloud*, 993

---

[18] *See supra*, note 14.

F.3d at 384 (quoting *Graham*, 490 U.S. at 396). And the video shows that, contrary to what Plaintiff argues, he did more than widen his stance; he turned his body toward the front of the police car, away from Kirst, and took a step in that direction. (*See* Defs. Ex. H, Bodycam Footage of Allen at 25:08–11; *see also id.* at 25:06–09 (Plaintiff stating, "you putting cuffs on my a–s?" as Kirst attempted to shackle his ankles and then stating "what the f–k are you doing?" as he stepped to the left away from Kirst).) The body camera footage shows that Kirst did not tackle Plaintiff, (*id.* at 25:10–11); rather, he forced him to the ground in an effort to gain compliance so his legs could be shackled. *See Priest v. Grazier*, 860 F. App'x 343, 347 (5th Cir. 2021) ("In a series of non-precedential but analogous cases, we have held that qualified immunity protects officers who force noncompliant suspects to the ground for handcuffing.") (collecting cases).

Although Plaintiff argues that he widened his stance *out of reflex*, not to resist Kirst's attempt to put shackles on him, his subjective reasons for moving are of no consequence here. The Court must "measure excessive force by the objective circumstances, not by the subjective intentions of the arrestee." *Cloud*, 993 F.3d at 386 (citation omitted) (the argument that the arrestee turned around to read the officer's lips—not as an act of resisting arrest—even if true, did "not change the objective excessive-force analysis" because the officer did not know the arrestee had any hearing impairment at the time). Kirst made a split-second judgment in a rapidly developing situation—after having been shoved and struck in the face approximately twenty minutes earlier—to take Plaintiff to the ground based on what he perceived as resistance. Thus, reasonable jurors could not find that Kirst's use of force, as well as the degree of the force used, was "clearly unreasonable" or clearly excessive under the totality of the circumstances. *Freeman*, 483 F.3d at 416 (citation omitted). Consequently, summary judgment is granted on this claim.

### F. Delay and Denial of Medical Treatment

The final constitutional claim before the Court is Plaintiff's claim that Defendants delayed and denied him adequate medical treatment in violation of the Fourteenth Amendment. (*See Compl.* ¶ 28, Doc. 1.) After considering all the evidence, the Court finds that summary judgment is warranted on this claim. In sum, no reasonable jury could conclude that the officers' actions rose to the level of deliberate indifference.

### 1. Parties' Arguments

As noted above, Plaintiff conflates his excessive force claim with his claim for "Denial/Delay of Medical Treatment" in violation of the Fourteenth Amendment.[19] Relevant to the claim regarding medical care, the *Complaint* provides the following:

> Instead of heeding Mr. Sanford's cries in agony, that he could not breathe, and requests for water, and obtaining medical help, the officers continued to torment Mr. Sanford with no sense of urgency as he laid on the ground suffering. Instead, the officers belittled his claims of serious injuries, delayed medical treatment, and denied him an ambulance ride to the trauma unit of Our Lady of the Lake Regional Medical Center. Ultimately, they crammed his six foot six inch, 270 pound body, back into the back of the police unit, forcing him to ride cuffed hand and foot in a vehicle very much too small to accommodate his large size and life threatening injuries, to a hospital with no trauma unit.

(*Compl.* ¶ 14, Doc. 1.)

Responding individually to each "count" asserted in the *Complaint*, Defendants, in addressing Plaintiff's claims for excessive force and denial or delay of medical treatment, provide little argument as to the latter. Defendants contend that the injuries Plaintiff sustained when he was taken to the ground near the police unit occurred "while EMS was present and ready to provide medical care." (Doc. 15-1 at 9.)

---

[19] *See supra*, note 8.

Plaintiff, in similar fashion, conflates these separate claims in his opposition brief. (*See* Doc. 25 at 8–9.) According to Plaintiff, Defendants' actions caused him numerous injuries, including six fractures to his ribs in twenty-three places and a punctured lung that required pneumothorax surgery. (*Id.* at 8.) After he was pinned to the ground by Kirst, Plaintiff claims that he was transported to the "wrong hospital" because the hospital he was initially taken to did not have "a trauma center capable of treating [his] life-threatening injuries[.]" (*Id.* at 9.) He also points out that he was transported to this hospital "by police car, not ambulance." (*Id.* (citing Kirst Depo, 50: 21–25, Doc. 20-1).) After his transfer to another hospital with a trauma center capable of handling his injuries, he argues that he was subjected to "unnecessary cruel and intentional aggravation of pain . . . by [being] handcuffed to the bed for several days." (*Id.* (citing Sanford Aff., Doc. 27-9); *see also* Sanford Depo, 19: 17–25, 20: 1–19, Doc. 20-8.)

Plaintiff concedes that "BR standard operating procedure requires" that he be "guarded at all times," but he argues that Defendants intentionally aggravated his pain and denied him adequate medical treatment by handcuffing him to the bed for several days because (a) BR standard operating procedure does not impose this requirement, and (b) "Kirst knew he had inflicted broken ribs and a punctured lung on Sanford." (*Id.* (first citing BRPD General Order 135, Less-Lethal Force, Doc. 20-16; then citing Kirst Depo, 78: 17–21, Doc. 20-1).) Plaintiff concludes by arguing that "[w]hether Kirst did this out of ignorance of BRPD policies or malice is a jury question." (*Id.*)

## 2. Applicable Law

"Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017) (citing *Cupit v. Jones*, 835 F.2d 82, 84–85 (5th Cir. 1987)). "The appropriate standard to apply in analyzing constitutional challenges brought by pretrial detainees depends on whether the alleged

unconstitutional conduct is a 'condition of confinement' or 'episodic act or omission.' " *Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018) (quoting *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (in turn quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc))). In cases "where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an 'episodic act or omission' case[.]" *Scott*, 114 F.3d at 53 (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996)); *see also Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (where a detainee claimed that an officer refused to provide immediate medical treatment was classified as an "episodic act or omission" case).

The Fifth Circuit applies the "deliberate indifference" standard to "episodic act or omission cases." *Westfall*, 903 F.3d at 551 (cleaned up). "Under that standard, [the plaintiff] must show that each officer acted with subjective deliberate indifference to [his] need for medical care." *Id.* (citing *Tamez*, 589 F.3d at 770). Showing subjective deliberate indifference by an official requires the plaintiff to demonstrate "that the official knew of and disregarded a substantial risk of serious harm." *Alderson*, 848 F.3d at 419–20 (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)). "Deliberate indifference is an extremely high standard to meet." *Gobert*, 463 F.3d at 346 (cleaned up). "A plaintiff can show deliberate indifference by showing that an official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Alderson*, 848 F.3d at 422 (quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006)). However, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Id.* at 420 (quoting *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).

"A delay in medical care violates the [Fourteenth] Amendment only if it is due to deliberate indifference *and* results in substantial harm." *Smith v. Milhauser*, 444 F. App'x 812, 813 (5th Cir. 2011) (emphasis added) (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)); *see also Westfall*, 903 F.3d at 551 (citations omitted). "The pain suffered during the delay [in treatment] can constitute a substantial harm and form the basis for an award of damages." *Westfall*, 903 F.3d at 551 (citing *Alderson*, 848 F.3d at 422).

### 3. Analysis

Because this case is properly characterized as an "episodic act or omission" case, *Scott*, 114 F.3d at 53 (citations omitted), in order to demonstrate a constitutional violation, Plaintiff "must show that each officer acted with subjective deliberate indifference to [his] need for medical care." *Westfall*, 903 F.3d at 551 (citing *Tamez*, 589 F.3d at 770). In sum, Plaintiff's claim here fails because Kirst and Allen's actions did not amount to subjective deliberate indifference. Neither officer refused Plaintiff medical treatment, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct that "would clearly evince a wanton disregard for any serious medical needs." *Alderson*, 848 F.3d at 422 (quoting *Easter*, 467 F.3d at 464).

Contrary to Plaintiff's allegations, the officers did not "continue[ ] to torment [him] with no sense of urgency as he laid on the ground suffering." (*Compl.* ¶ 14, Doc. 1.) The video evidence shows that Plaintiff was only on the ground for as long as it took the officers to shackle his ankles and EMS to remove the taser prongs from his body; immediately after, he was rolled to a sitting position so that the officers could assist him in standing up. (Defs. Ex. G, Bodycam Footage of Kirst at 26:30–28:00.) And, as Defendants correctly point out, EMS was on the scene before, during, and after Plaintiff sustained his injuries. (Doc. 15-1 at 9; *see also* Defs. Ex. G, Bodycam Footage of Kirst at 27:54–27:56 (as officers are assisting Plaintiff in standing up, Plaintiff says

"where's EMS?" to which someone—it is unclear who—responds, "right here").) Further, after Plaintiff was taken to the ground and expressed numerous times that his ribs were broken and that he could not breathe, EMS approached him, asked where he felt the complained-of pain, and proceeded to "take a listen" (which, based on the video, the Court interprets to be EMS listening to his heart and/or lungs with a stethoscope). (Defs. Ex. G, Bodycam Footage of Kirst at 28:00–28:10 (EMS responding to Plaintiff's complaints of pain: "I'll take a listen to you, okay?"); *id.* at 29:45–29:47 (EMS asking Plaintiff "which side?" while putting the stethoscope on in what appeared to be an attempt to determine which ribs and/or lungs may be injured).)

It is unclear why more was not done to treat Plaintiff's injuries at the scene, but what is clear is that whatever mistakes might have been made regarding his treatment at that time does not fall on the officers. The officers assured Plaintiff that he would be taken to a hospital, and approximately twenty-five minutes after the incident, Kirst departed for Our Lady of the Lake North with Plaintiff in the car. (*Id.* at 53:00.) They arrived at the hospital around ten minutes later. (*Id.* at 1:04:16.) Even if EMS had not been present during the entire encounter—which supports a finding that the officers' actions were not deliberately indifferent in itself—Kirst's twenty-five-minute delay in transporting Plaintiff to the hospital does not exhibit a wanton disregard for Plaintiff's medical needs. *See Westfall*, 903 F.3d at 551 ("Although Westfall may have been in pain during that time, the officers' half-hour delay in calling for medical assistance does not clearly evince a wanton disregard for Westfall's medical needs.").

Although Plaintiff suggests that Kirst intentionally treated him incorrectly or recklessly disregarded his serious medical needs by transporting him by police car, rather than by ambulance, "to the wrong hospital[,]" (Doc. 25 at 9), he fails to show how these actions rise to the level of subjective deliberate indifference. The entirety of his argument here rests on the fact that the

hospital he was initially taken to, Our Lady of the Lake North, did not have a trauma unit. But according to Kirst's deposition testimony, that hospital is "where [BRPD officers] generally take prisoners." (Kirst Depo, Doc. 20-1 at 51: 10–11.) Further, while policies of a department do not definitely establish whether an official acted with deliberate indifference, BRPD policy instructs officers to bring an injured arrestee "to the Our Lady of the Lake Hospital or LSU BR Urgent Care . . . prior to being booked." (BRPD General Order 206, Injury or Property Damage Sustained on Duty, Doc. 20-17 at 1.) This is exactly what Kirst did. That the hospital was not able to adequately address his serious injuries due to the lack of a trauma unit is not enough to show Kirst "intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Alderson*, 848 F.3d at 422 (quoting *Easter*, 467 F.3d at 464).

As to Plaintiff not being transported by ambulance, the BRPD policy further provides that "whether the arrestee will be transported by ambulance or by police unit" is determined by the extent of the arrestee's injuries. (BRPD General Order 206, Injury or Property Damage Sustained on Duty, Doc. 20-17 at 1.) Thus, whether an ambulance ride is necessary appears to be a discretionary decision—to whom the discretion is given, it is unclear. (*See, e.g.*, Allen Depo, Doc. 20-5 at 48: 21–25, 49: 1–3 (when asked why EMS did not take Plaintiff to the hospital and who made that decision, Allen responded he was not sure as to why and that it is "an EMS call.").) This is not to say that Plaintiff's injuries were not serious enough to warrant being transported by ambulance; it is undisputed that Plaintiff suffered severe injuries here. But this decision, even if wrong, was, at worst, the kind of "inept, erroneous, ineffective, or negligent" decision that "do[es] not amount to deliberate indifference." *Alderson*, 848 F.3d at 420 (quoting *Alton*, 168 F.3d at 201).

Lastly, for essentially the same reasons stated above, the officers' decision to keep Plaintiff handcuffed to his hospital bed for several days also does not rise to the level of deliberate indifference. To show an official acted with deliberate indifference to one's medical needs, the plaintiff must demonstrate "that the official knew of and disregarded a substantial risk of serious harm." *Id.* at 420 (citing *Domino*, 239 F.3d at 755). Plaintiff has shown neither here with respect to his being handcuffed to the bed during part of his hospital stay. Accordingly, summary judgment is granted on this issue.

## V.  Jurisdictional Analysis as to Pendent State Law Claims

"With all federal claims having been dismissed . . . , the Court will now 'look to the statutory factors set forth by 28 U.S.C. § 1367(c), and to the common law factors of judicial economy, convenience, fairness, and comity' to decide whether to exercise its discretion to 'relinquish jurisdiction over pendent state law claims.' " *Conway v. Louisiana Through DPS&C*, No. 18-33, 2021 WL 357357, at *1 (M.D. La. Feb. 2, 2021) (deGravelles, J.) (quoting *Enochs v. Lampasas Cty.*, 641 F.3d 155, 159 (5th Cir. 2011) (first citing *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (noting that "no single factor is dispositive"); then citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (setting forth the common law factors))). "The Court is also instructed to guard against improper forum manipulation, though that does not appear to be a factor here." *Id.* (cleaned up). "The Court must 'consider and balance each of the factors to determine' how to exercise its discretion." *Id.* (quoting *Enochs*, 641 F.3d at 159 (citing *Mendoza*, 532 F.3d at 346)).

"The statutory factors are: (1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional

circumstances or other compelling reasons for declining jurisdiction." *Id.* (citing *Enochs*, 641 F.3d at 159 (citing 28 U.S.C. § 1367(c))). The state law claim for false arrest appears complex, particularly because of Plaintiff's reliance on the justification defense set forth in La. R.S. 14:19 and the uncertain interplay between that defense to criminal prosecution and the probable cause analysis required for a civil claim of false arrest. "[T]he second and third factor[s] weigh strongly against retaining jurisdiction, as the 'state law claims predominate over the non-existent federal claims' and this court 'dismissed all federal claims.' " *Conway*, 2021 WL 357357, at *1 (quoting *Enochs*, 641 F.3d at 159). "Neither party cites to a compelling reason for declining jurisdiction, so the fourth factor is neutral." *Id.* (citation omitted). Thus, three of the four factors weigh heavily in favor of declining to exercise supplemental jurisdiction (and two heavily so). Consequently, the overall balance of the statutory factors demonstrates that they "weigh strongly in favor of declining jurisdiction." *See id.* (reaching this conclusion when only the second and third factors weighed "strongly against retaining jurisdiction").

"The Court now turns to the common law factors of 'judicial economy, convenience, fairness, and comity.' " *Id.* at *2. "These considerations include whether extensive or substantive motions have been filed and/or ruled on, whether a scheduling order has been issued, whether hearings have been held, the relative convenience of the relevant state and federal courthouses, and whether it will prejudice either party to have the state law claims heard in state court." *Id.* (quoting *Pullins v. Hancock Whitney Bank*, No. 19-00006, 2021 WL 96246, at *12 (M.D. La. Jan. 11, 2021) (Dick, C.J.) (citing *Hicks v. Austin Indep. Sch. Dist.*, 564 F. App'x 747, 749 (5th Cir. 2014))).

The common law factors likewise weigh in favor of declining to exercise supplemental jurisdiction here. Save the *Motion* made the subject of this ruling, no dispositive motions have

been filed in this case. Although a motion in limine was filed, that motion was withdrawn and thus the Court never considered it. (*See* Docs. 30, 31.) Most importantly, however, the Court has yet to substantively rule on any motion dealing with the state law claims. In fact, "there is no indication that the district court had any 'substantial familiarity' or was intimately familiar with the [Louisiana] state law claims[.]" *Conway*, 2021 WL 357357, at *2 (quoting (quoting *Enochs*, 641 F.3d at 159–160). Moreover, while a scheduling order was issued, no hearing or pretrial conference has been held; indeed, the pretrial conference and the trial date are both more than three months away. (*See* Doc. 35.)

In addition, there is no indication that this federal forum is more convenient than the state forum, nor is there any reason why either side will be materially prejudiced by having these claims adjudicated in state court. And, as another section of this Court stated, "considering the docket backlog created in this Court by the COVID-19 pandemic, the Court finds that the best use of judicial resources for this Court and the state court is to have the state court preside over a purely state law claim." *Conway*, 2021 WL 357357, at *2 (quoting *Pullins*, 2021 WL 96246, at *12). Finally, like this Court found in *Conway*:

> The other common law factors also weigh in favor of sending this case to state court. Second, concerning convenience, "as the judicial economy factor suggests," pursuing the case in state court "would not [ ] cause[ ] any financial inconvenience to the parties because they would not have had to duplicate any of their previous efforts or expenses." *Enochs*, 641 F.3d at 160 (citing *Mendoza*, 532 F.3d at 347) . . . "Third, it [would] certainly [be] fair to have [ ] the purely [Louisiana] state law claims heard in [Louisiana] state court, and there is nothing to indicate that either party would have been prejudiced by" sending this case to Louisiana state court. *Id.* (citing *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 588 (5th Cir. 1992)). "And fourth, comity demands that the 'important interests of federalism and comity' be respected by federal courts, which are courts of limited jurisdiction and 'not as well equipped for determinations of state law as are state courts.' " *Id.* (quoting *Parker & Parsley*, 972 F.2d at 588–89). Thus, as in

> *Enochs*, "[t]he convenience, fairness, and comity factors each
> certainly favors remand, and the overall balance of the common law
> factors weighs heavily in favor of remand." *Id.*

*Id.*

The final reasons for declining to exercise supplemental jurisdiction set forth in *Conway*

further demonstrate why the same result is warranted here:

> Ultimately, "[a] district court has 'wide discretion' in deciding
> whether it should retain jurisdiction over state law claims once all
> federal claims have been eliminated." *Id.* at 161 (citing *Guzzino v.
> Felterman*, 191 F.3d 588, 595 (5th Cir. 1999)). But:
>
> > "Our general rule is to dismiss state claims when the
> > federal claims to which they are pendent are
> > dismissed." *Parker & Parsley*, 972 F.2d at 585
> > (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir.
> > 1989)); *see Carnegie–Mellon*, 484 U.S. at 351, 108
> > S. Ct. 614 (noting that when the federal claims are
> > eliminated at an "early stage" of the litigation the
> > district court has "a powerful reason to choose not to
> > continue to exercise jurisdiction"); *Gibbs*, 383 U.S.
> > at 726, 86 S. Ct. 1130 ("Certainly, if the federal
> > claims are dismissed before trial, even though not
> > insubstantial in a jurisdictional sense, the state claims
> > should be dismissed as well."); *Brookshire Bros.*,
> > 554 F.3d at 602 (noting that "the general rule is that
> > a court should decline to exercise jurisdiction over
> > remaining state-law claims when all federal-law
> > claims are eliminated before trial"); *Beiser v. Weyler*,
> > 284 F.3d 665, 675 (5th Cir. 2002) (noting that where
> > "no other grounds for federal jurisdiction exist, the
> > court must ordinarily remand the case back to state
> > court"). Indeed, the Supreme Court has for nearly
> > half a century cautioned federal courts to avoid
> > "[n]eedless decisions of state law[.]" ...*Gibbs*, 383
> > U.S. at 726, 86 S. Ct. 1130.
>
> *Id.* Under these circumstances, the Court will decline to exercise
> supplemental jurisdiction over the remaining state law claims, and
> they are dismissed without prejudice.

*Id.* at *3. For these and the above-stated reasons, the Court will follow the same course in this case.

## VI.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 15) filed by Defendants Joshua Kirst, Herbert Allen, and the City of Baton Rouge (collectively, "Defendants") is **GRANTED** with respect to the federal claims; consequently, all federal claims asserted against Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Court will decline to exercise supplemental jurisdiction over the state law claims, and these claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that all pending deadlines, including the pretrial conference and trial, are **CANCELLED**.

**IT IS FURTHER ORDERED** that judgment shall be entered in this case.

Signed in Baton Rouge, Louisiana, on June 16, 2023.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**